## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

CELLULAR EXPRESS, INC. d/b/a )
BOSTON COMMUNICATIONS GROUP )
AND BOSTON COMMUNICATIONS )
GROUP, INC. )
                                 )

      **Plaintiffs,** )          **CIVIL ACTION NO: 07-694 (rbw)**

                                 )

      **v.** )

                                   )

SMITH BAGLEY, INC. d/b/a )
CELLULAR ONE OF NORTHEAST )
ARIZONA )
                                 )

      **Defendant.** )
_____ )

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

      Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs Cellular Express, Inc.

d/b/a Boston Communications Group and Boston Communications Group, Inc. (collectively,

"BCGI"), by and through undersigned counsel, respectfully submit this Motion for Partial

Summary Judgment.  A Memorandum in Support of this Motion, Proposed Order, Statement of

Material Facts as to Which There is No Genuine Issue, and accompanying exhibits are attached.

                       Respectfully submitted,

                       /s Christopher B. Mead_____
                       Mark London (D.C. Bar No. 293548)
                       Christopher B. Mead (D.C. Bar No. 411598)
                       1225 19th Street, N.W., Suite 320
                       Washington, D.C.  20036
                       (202) 331-3334
                       *Counsel for Plaintiffs*

Dated: September 28, 2007

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CELLULAR EXPRESS, INC. d/b/a** | ) | |
| **BOSTON COMMUNICATIONS GROUP** | ) | |
| **AND BOSTON COMMUNICATIONS** | ) | |
| **GROUP, INC.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION NO: 07-694 (rbw)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **SMITH BAGLEY, INC. d/b/a** | ) | |
| **CELLULAR ONE OF NORTHEAST** | ) | |
| **ARIZONA** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## [PROPOSED] ORDER

Upon consideration of Plaintiff's Motion for Partial Summary Judgment, any

response thereto, and any related documents, it is hereby ORDERED that the foregoing motion

is GRANTED.

SO ORDERED on this _____ day of _____, 2007.


_____
Reggie B. Walton
United States District Court Judge

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

CELLULAR EXPRESS, INC. d/b/a )
BOSTON COMMUNICATIONS GROUP )
AND BOSTON COMMUNICATIONS )
GROUP, INC. )
 )
 Plaintiffs, )  CIVIL ACTION NO: 07-694 (rbw)
 )
 v. )
 )
SMITH BAGLEY, INC. d/b/a )
CELLULAR ONE OF NORTHEAST )
ARIZONA )
 )
 Defendant. )
————————————————————)

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

  Plaintiffs Cellular Express, Inc. d/b/a Boston Communications Group and Boston

Communications Group, Inc. (collectively, "BCGI"), by and through undersigned counsel,

respectfully submit this Memorandum in Support of their Motion for Partial Summary Judgment.

**INTRODUCTION**

  This case involves a dispute between BCGI and Defendant Smith Bagley, Inc.

d/b/a Cellular One of Northeast Arizona ("Smith Bagley") over a Prepaid Connection Agreement

("PCA") entered into by the parties in March 2000.  Smith Bagley contracted in the PCA to

purchase from BCGI certain equipment, software, and services related to wireless

telecommunications.  Contemplating that BCGI's equipment or software might become subject

to a claim of patent infringement, the parties expressly contracted for the remedies available in

such an event.  According to the PCA, BCGI had the right: (1) to procure for Smith Bagley the

ability to use the infringing equipment or software; (2) to replace such equipment or software

1

with non-infringing equipment or software; or (3) if neither of the first two options were

"reasonably practical," to terminate the PCA and refund any applicable charges.  The PCA

further provided that BCGI's three options were "the exclusive remedy" available to either party

in the event of a claim of infringement.

Smith Bagley eschewed the plain and unmistakable terms of the contract, and

unilaterally terminated the PCA on January 31, 2006, with more than three years remaining on

the contract.  Smith Bagley cited as the reason for its termination a patent-infringement lawsuit

filed against BCGI in early 2000.  But this putative rationale was entirely without legal basis:

The patent-infringement lawsuit did not impede BCGI's provision of services to Smith Bagley,

and termination by Smith Bagley was not an available remedy pursuant to the PCA.  Because

Smith Bagley's unilateral termination was a breach of the PCA, and because there are no

material facts in dispute that would prevent a finding of breach as a matter of law, BCGI is

entitled to summary judgment as to its breach-of-contract claim.

## FACTUAL BACKGROUND

### I.    The Prepaid Connection Agreement

BCGI is in the business of providing mobile telecommunications billing services.

Statement of Material Facts as to Which There is No Genuine Issue ["Statement"] ¶ 1.  Smith

Bagley is in the business of providing cellular mobile services, as well as network and data

services.  *Id.* ¶ 2.  On or about March 1, 2000, BCGI and Smith Bagley entered into the PCA,

pursuant to which Smith Bagley agreed to purchase "equipment, software, and services" from

BCGI.  *Id.* ¶ 3.  BCGI's services permitted Smith Bagley "to offer prepaid wireless service to

their subscribers and take advantage of the Prepaid Wireless features and the national network

2

for roaming." *Id.* ¶ 4.  The PCA had an original term of two years, subject to automatic renewal

for additional two-year periods.  *Id.* ¶ 5.  The PCA provided that it was governed by

Massachusetts law.  *Id.* ¶ 6.

    The parties, as evidenced by the PCA, contemplated that BCGI's software and

services might become the subject of a patent-infringement claim, and contracted for the

remedies available to the parties in the event such a claim were made.  Paragraph 14 expressly

provided that, in the event of a "claim of infringement of any duly issued United States patent or

copyright" involving equipment or software purchased under the PCA,

> BCGI at its option may: (i) procure for [Smith Bagley] the right to
> continue to use the Equipment or Software, (ii) replace or modify
> the Equipment or Software so that it is non-infringing; or (iii) if
> neither of the foregoing alternatives is reasonably practical, BCGI
> may remove the Equipment or software and refund the applicable
> Purchase Price and Installation Charge payments made to BCGI,
> reduced by an amount equal to the depreciated portion of the
> payments.

*Id.* ¶ 7.  Paragraph 14 further provided that the foregoing three options formed "THE

EXCLUSIVE REMEDY OF [SMITH BAGLEY] FOR INFRINGEMENT OR CLAIMS OF

INFRINGEMENT OF ANY THIRD PARTY PATENT, COPYRIGHT, OR OTHER

INTELLECTUAL PROPERTY RIGHT BY THE EQUIPMENT OR SOFTWARE."  *Id.*

(emphasis in original).  By its plain terms, therefore, the PCA did not permit Smith Bagley to

terminate the PCA if BCGI exercised one of the three options prescribed in Paragraph 14.

    On or about March 30, 2001, just more than one year into the two-year term of

the PCA, BCGI and Smith Bagley entered into an Addendum that extended the PCA by three

years, until March 1, 2004, and left in place the automatic renewal provision.  *Id.* ¶ 9.  This

Addendum also provided that, "[d]uring the Term of this Agreement, BCGI will be the exclusive provider of prepaid wireless services to [Smith Bagley] and [Smith Bagley] will not contract with or receive prepaid wireless services from any other prepaid wireless provider." *Id.* ¶ 10.[1] The parties extended the term of the PCA three more times, with the last of the extensions running until March 1, 2009. *See id.* ¶ 9. Each time, the parties reiterated the PCA's automatic renewal provision. *See id.*

## II.    The Patent Litigation

On March 30, 2000, Freedom Wireless, Inc. filed a patent-infringement lawsuit against BCGI and a number of other telecommunications-services providers and users. *Id.* ¶ 11. BCGI vigorously defended itself at trial, but on May 20, 2005, a jury found infringement. *Id.* ¶ 12. Following the jury trial, BCGI attempted through a bench trial on its affirmative defenses and numerous post-trial motions to vacate or reduce the jury verdict. *Id.* ¶ 13. BCGI's efforts in the trial court were ultimately unsuccessful, however, and on September 1, 2005, judgment was entered against BCGI. *Id.* ¶ 14.

On October 12, 2005, the U.S. District Court for the District of Massachusetts enjoined BCGI "from making, using, selling, or offering to sell the prepaid wireless service implementations—multi-frequency (MF), common channel signaling system seven (SS7), and pre-intelligent network (pre-IN)—found to infringe Plaintiff Freedom Wireless, Inc.'s patents" ("the Injunction"). *Id.* ¶ 15. The Injunction further provided "a 'grace period' of 90 days from

---

[1]    Paragraph 17(d) provided that the PCA "constitutes the entire agreement between BCGI and [Smith Bagley]" and "may be amended, terminated, or altered only by an instrument in writing." Statement ¶ 8. Although the parties executed several subsequent addenda to the PCA, they did not alter the remedies provision in Paragraph 14 or the exclusivity provision in

today's date [October 12, 2005], during which defendants are prohibited from adding any new prepaid customers, for defendants' customers to use the remainder of their prepaid balances and find an alternative carrier." *Id.* ¶ 16.  Thus, the Injunction did not have any immediate effect on BCGI's ability to service its existing customers, including Smith Bagley, and would not have any effect until January 10, 2006, at the earliest. *Id.* ¶ 17.

BCGI filed a motion with the trial court to stay the Injunction, and on October 20, 2005, it noticed an appeal to the United States Court of Appeals for the Federal Circuit. *Id.* ¶ 18. The District Court denied the motion to stay the Injunction, and on November 14, 2005, BCGI filed an emergency motion with the Federal Circuit to stay the Injunction pending appeal. *Id.* ¶¶ 19–20.  The Federal Circuit granted a temporary stay the following day—November 15, 2005— and on December 15, 2005, the court extended the stay for the pendency of the appeal. *Id.* ¶¶ 21–22.  Accordingly, the Injunction was stayed long before the expiration of the 90-day "grace period."

In July 2006, while the appeal was pending before the Federal Circuit, and while the stay of the Injunction was in effect, BCGI and Freedom Wireless entered into a settlement agreement contingent on the trial court's vacatur of the Injunction and the judgment against BCGI. *Id.* ¶ 30.  As part of the settlement, BCGI acquired licenses from Freedom Wireless to use the infringing technology. *Id.* ¶ 31.  These licenses expressly permitted use of the technology by BCGI's customers (including Smith Bagley), partners, and suppliers. *Id.*  In view of the parties' settlement, on October 12, 2006, the District Court vacated the Injunction and the judgment against BCGI. *Id.* ¶ 32.

---

Paragraph 1 of the March 1, 2001 addendum.

### III.    Smith Bagley's Unilateral Termination of the PCA

On December 19, 2005, several days after the Federal Circuit stayed the Injunction during the pendency of the appeal, BCGI forwarded Smith Bagley an e-mail regarding the Federal Circuit's order. *Id.* ¶ 23. The December 19 e-mail also included a third-party analyst report titled, "Boston Communications Group, Inc.—A New Lease on Life," which referenced the Federal Circuit's stay. *Id.* Smith Bagley's Chief Operations Officer, Richard Watkins, acknowledged receipt of the e-mail the next day, December 20, 2005. *Id.* ¶ 24.

Despite being aware of the stay issued by the Federal Circuit, and without notice to BCGI, Smith Bagley began migrating its customers to VeriSign Inc., another and less expensive provider of wireless telecommunications services and products. On February 2, 2006, BCGI's Network Operations Center noticed a dramatic drop in telecommunications traffic from Smith Bagley. *Id.* ¶ 25. Upon inquiry from BCGI, the Smith Bagley switch tech informed the BCGI Network Operations Center that they expected this behavior as they were currently moving facilities to their new prepaid platform. *Id.* In immediate follow-up, BCGI's Client Relations liaison to Smith Bagley, Tim Quinlivan, spoke with Mr. Watkins to inquire about the drop-off, and Mr. Watkins responded by forwarding a pdf copy of a letter announcing that Smith Bagley was unilaterally terminating the PCA effective January 31. *Id.* ¶¶ 26–27. On February 3, counsel for BCGI responded to the termination letter by facsimile and certified mail, reminding Smith Bagley that the Injunction was of no effect and requesting that Smith Bagley confirm, within five business days, that it had restored its service relationship with BCGI. *Id.* ¶ 28. Smith Bagley did not respond to the February 3 letter. Instead, it proceeded to terminate the PCA and to replace BCGI's services with those of VeriSign Inc. *Id.* ¶ 29.

## ARGUMENT

### I.    Governing Legal Standards

Fed. R. Civ. P. 56 provides that a party is entitled to judgment as a matter of law when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Summary judgment is particularly appropriate when "the unresolved issues are primarily legal rather than factual." *Wyoming Outdoor Council v. Dombeck*, 148 F. Supp.2d 1, 7 (D.D.C. 2001).

To prevail on a breach of contract claim under Massachusetts law, a party must show "(1) that there is a contract, (2) that the party performed its obligations under the contract (or is excused from performance), (3) that the other party breached the contract, and (4) that the nonbreaching party suffered damages as a result of the breach of contract." Mass. Super. Ct. Civil Practice Jury Inst. § 14.1.19; *see also Lorandger Const. Corp. v. E. F. Hauserman*, *Co.*, 294 N.E.2d 453, 453 (Mass. App. 1973) (calling for "an agreement, breach and the resulting damages"). Contract interpretation is a matter of law when the terms being applied are unambiguous. *Cabot Corp. v. AVX Corp.*, 863 N.E.2d 503, 506 (Mass. 2007).

### II.    BCGI Is Entitled to Judgment as a Matter of Law on Its Breach-of-Contract Claim

BCGI is entitled to judgment as a matter of law on its breach-of-contract claim. The applicable terms of the PCA are unambiguous and therefore susceptible to only one interpretation as a matter of law, and there is no genuine issue of material fact that BCGI performed its obligations under the PCA and that Smith Bagley breached the PCA.

7

### A. BCGI Performed its Obligations Under the PCA

It is beyond dispute that BCGI performed its obligations under the PCA and at all times provided to Smith Bagley the contracted-for equipment, software, and services. When faced with a claim for patent infringement concerning the equipment, software, and services being provided to Smith Bagley, BCGI exercised the exclusive remedies available to it pursuant to the PCA and never ceased providing the contracted-for equipment, software, and services. After the jury found infringement and the trial court issued an injunction (which provided a 90-day grace period), BCGI sought and obtained a stay from the Federal Circuit during the pendency of the appeal. Moreover, while the stay was in effect, BCGI secured from Freedom Wireless a license permitting it to continue providing the same equipment, software, and services to Smith Bagley under the PCA, and settled the patent litigation, leading to permanent vacatur of the Injunction. During and after the litigation, BCGI provided uninterrupted service to its customers, including Smith Bagley.

As a matter of law, BCGI fulfilled its obligations under the PCA. The PCA unambiguously provided that, in the event of a "claim of infringement of any duly issued United States patent or copyright" involving equipment or software purchased under the PCA, BCGI "at its option" could: (1) procure for Smith Bagley the right to use the equipment or software; (2) replace or modify the equipment or software so it was no longer infringing; or (3) terminate the relationship and offer a partial refund. Statement ¶ 7. BCGI acted in full conformity with the PCA. As set forth above, BCGI secured a license permitting it to continue providing to Smith Bagley the equipment, software, and services contracted-for in the PCA, and its provision of such equipment, software, and services was never interrupted by the claim of patent

infringement.  As a matter of law, then, BCGI has satisfied this prong of its breach-of-contract claim.

### B.  Smith Bagley Breached the PCA

It likewise is beyond dispute that, as a matter of law, Smith Bagley breached the PCA by unilaterally and without basis terminating the contract.  In its letter notifying BCGI of the termination, Smith Bagley claimed that the termination was due to "recent events in your litigation with Freedom Wireless."  *Id.* ¶ 27.  This putative basis for the termination was without merit as a matter of law.

By its plain and unambiguous terms, the PCA did not permit Smith Bagley to unilaterally terminate in the event of an infringement claim.  The PCA provided that BCGI's three options in Paragraph 14 of the Agreement were the "exclusive remedy . . . for infringement or claims of infringement."  *Id.* ¶ 7.  Paragraph 14 of the PCA is susceptible of only one meaning:  Smith Bagley was compelled to accept BCGI's decision to secure a license and could not terminate the Agreement.  *See Charland v. Muzi Motors, Inc.*, 631 N.E.2d 555, 558 (Mass. 1994) (statute declaring that "procedure provided in this chapter shall . . . be exclusive" provides sole remedy).  As a matter of law, then, Smith Bagley's manifest refusal to adhere to Paragraph 14 constituted a breach of the PCA.

Smith Bagley cannot justify its termination on the ground that BCGI breached the agreement by providing infringing products and software.  BCGI fulfilled its obligations under the PCA, and the Injunction never took effect for BCGI's customers.  It is uncontroverted that, at the time it terminated the PCA, Smith Bagley was aware that the Injunction had been stayed during the pendency of the appeal:  Not only did BCGI notify Smith Bagley that the Injunction

was of no effect, but Smith Bagley waited until three weeks **after** what would have been the 90-day "grace period" to migrate its customers to another service provider. *See* Statement ¶¶ 16–17, 27. Smith Bagley cannot, therefore, claim to have anticipatorily repudiated because it feared a breach by BCGI. *See Northern Heel Corp. v. Compo Indus.*, 851 F.2d 456, 460–61 (1st Cir. 1988) (repudiating party had "neither requested clarification nor asked [the other party] to respond to its emerging concerns"; repudiation thus was improper under Massachusetts law because no material breach had occurred).

Nor can Smith Bagley justify its termination on the ground that the Injunction prevented it from fulfilling its contractual duties. Although a party may be able to avoid a contractual obligation in the event of impossibility or impracticability, *see* Restatement (Second) of Contracts § 264, here the Injunction was stayed and performance was not impossible or impracticable; indeed, BCGI's service to its customers, including Smith Bagley, proceeded without any interruption. *See Landis v. Hodgson*, 706 P.2d 1363, 1369 (Idaho 1985) (upholding lessee's impossibility defense where state took over property, but mandating payment to lessor for period of time before state legally took over); *J.J. Cassone Bakery, Inc. v. Consolidated Edison Co. of N.Y., Inc.*, 638 N.Y.S.2d 898, 903 (N.Y. Sup. Ct. 1996) ("Impossibility excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible."); *cf. Webster v. Southern Cal. First Nat'l Bank*, 137 Cal. Rptr. 293, 294 (Cal. App. 1977) (restraining order not sufficient excuse to support impossibility defense where defendant made no reasonable efforts to prevent it or procure its dissolution); *Peckham v. Indus. Sec. Co.*, 113 A. 799, 802 (Del. Super. Ct. 1921) (same). Accordingly, an "impossibility" defense is not available as a matter of law.

10

This is particularly so because the parties to the PCA expressly foresaw, at the time of contracting, circumstances that could render performance impossible or impracticable, and contracted for how they would handle such circumstances. This is a critical factor in assessing a purported "impossibility" defense:

> Was the contingency which developed one which the parties could reasonably be thought to have foreseen as a real possibility which could affect performance? Was it one of that variety of risks which the parties were tacitly assigning to the promisor by their failure to provide for it explicitly? If it were, performance will be required. If it could not be so considered, performance is excused.

*Mishara Construction Co., Inc. v. Transit-Mixed Concrete Corp.*, 310 N.E.2d 363 (Mass. 1974); *see also J.J. Cassone Bakery, Inc.*, 638 N.Y.S.2d at 903 ("[T]he impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract."); *Kel Kim Corp. v. Central Markets, Inc.*, 131 A.D.2d 947, 949 (N.Y. App. 1987) (inability to obtain liability insurance on property was foreseeable and risk should be borne by party who agreed to obtain it). Here, not only was a claim of infringement against BCGI foreseeable at the time of contracting, but the parties **expressly contemplated** such a possibility and specified in their contract precisely what the exclusive remedies were in the event such a claim were made. There is no genuine issue of material fact concerning Smith Bagley's awareness of the stay of the Injunction, *see* Statement ¶¶ 23–24,[2] and an impossibility defense therefore is not available as a matter of law. *See Glens Falls Indemnity Co. v. Perscallo*, 216 P.2d 567, 569 (Cal. App. 1950) (impossibility is a legal determination); *cf. Northern Heel Corp.*, 851 F.2d at 460–61 (holding that lawful repudiation defense failed as a matter of law).

---

[2] Summary judgment would be appropriate even if Smith Bagley did not know of the stay, since it was obligated under the PCA to permit BCGI the option of securing a license or

In view of the foregoing, as a matter of law Smith Bagley breached the PCA, and BCGI therefore is entitled to judgment as a matter of law on its breach-of-contract claim.

## **CONCLUSION**

For the foregoing reasons, BCGI respectfully requests that partial summary judgment on liability be granted in its favor.

Respectfully submitted,

/s Christopher B. Mead
Mark London (D.C. Bar No. 293548)
Christopher B. Mead (D.C. Bar No. 411598)
1225 19th Street, N.W., Suite 320
Washington, D.C.  20036
(202) 331-3334
*Counsel for Plaintiffs*

Dated: September 28, 2007

providing replacement software within the 90-day "grace period."  *See id.* ¶ 7.

12

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CELLULAR EXPRESS, INC. d/b/a** | ) | |
| **BOSTON COMMUNICATIONS GROUP** | ) | |
| **AND BOSTON COMMUNICATIONS** | ) | |
| **GROUP, INC.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION NO: 07-694 (rbw)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **SMITH BAGLEY, INC. d/b/a** | ) | |
| **CELLULAR ONE OF NORTHEAST** | ) | |
| **ARIZONA** | ) | |
| | ) | |
| **Defendant.** | ) | |

## STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE

1.    BCGI is in the business of providing mobile telecommunications billing services.

Ex. A (Stipulation of Material Facts) ¶ 1.

2.    Smith Bagley is in the business of providing cellular mobile services, as well as

network and data services. *Id.* ¶ 2.

3.    On or about March 1, 2000, BCGI and Smith Bagley entered into the Prepaid

Connection Agreement ("PCA"), pursuant to which Smith Bagley agreed to purchase

"equipment, software, and services from BCGI." *Id.* ¶ 3; Ex B (Prepaid Connection Agreement)

¶ 1.

4.    The PCA provided that it "allows the Customer [Smith Bagley] to offer prepaid

wireless service to their subscribers and take advantage of the Prepaid Wireless features and the

national network for roaming." Ex. B at Ex. 1.

5.      The PCA had an original term of two years, subject to automatic renewal for

additional two-year periods.  *Id.* ¶ 3.

6.      The PCA provided that its provisions are governed by Massachusetts law.  *Id.* ¶

17.c.

7.      Paragraph 14 of the PCA provided that, in the event of a "claim of infringement

of any duly issued United States patent or copyright" involving equipment or software purchased

under the PCA,

> BCGI at its option may: (i) procure for [Smith Bagley] the right to
> continue to use the Equipment or Software, (ii) replace or modify
> the Equipment or Software so that it is non-infringing; or (iii) if
> neither of the foregoing alternatives is reasonably practical, BCGI
> may remove the Equipment or software and refund the applicable
> Purchase Price and Installation Charge payments made to BCGI,
> reduced by an amount equal to the depreciated portion of the
> payments.

*Id.* ¶ 14.  Paragraph 14 further provided that the foregoing three options formed "THE

EXCLUSIVE REMEDY OF [SMITH BAGLEY] FOR INFRINGEMENT OR CLAIMS OF

INFRINGEMENT OF ANY THIRD PARTY PATENT, COPYRIGHT, OR OTHER

INTELLECTUAL PROPERTY RIGHT BY THE EQUIPMENT OR SOFTWARE."  *Id.*

(emphasis in original).

8.      Paragraph 17(d) of the PCA provided that it "constitutes the entire agreement

between BCGI and [Smith Bagley]" and "may be amended, terminated, or altered only by an

instrument in writing."  *Id.* ¶ 17(d).

9.      The provisions of the PCA were amended several times between March 2001 and

June 2004.  The June 2004 Addendum extended the term of the PCA until March 1, 2009.  Ex. A

¶ 4; Ex. B at Mar. 30, 2001 Add. ¶ 1 (extending term until Mar. 1, 2004); *id.* at Aug. 12, 2002

2

Add. ¶ 1 (extending term until Mar. 12, 2005); *id.* at Jan. 2004 Add. ¶ 1 (extending term until Mar. 1, 2006); *id.* at June 21, 2004 Add. ¶ 1 (extending term until Mar. 1, 2009).

10.    The March 30, 2001 Addendum added the following provision to the PCA: "During the Term of this Agreement, BCGI will be the exclusive provider of prepaid wireless services to [Smith Bagley] and [Smith Bagley] will not contract with or receive prepaid wireless services from any other prepaid wireless provider." Ex. B at Mar. 30, 2001 Add. ¶ 6.

11.    On March 30, 2000, Freedom Wireless, Inc. filed a patent infringement action in the United States District Court for the District of Massachusetts against BCGI and a number of others (the "Patent Litigation"). Ex. A ¶ 5; Ex. C (Freedom Wireless Decl.) ¶ 2; Ex. D (BCGI Decl.) ¶ 2.

12.    On or about May 20, 2005, a jury found that BCGI infringed Freedom Wireless, Inc.'s patented technology. Ex. A ¶ 6; Ex. C ¶ 3.

13.    Following the jury trial, BCGI attempted unsuccessfully through a bench trial on its affirmative defenses and numerous post-trial motions to vacate or reduce the jury verdict. Ex. A ¶ 7.

14.    On or about September 1, 2005, judgment was entered against BCGI. Ex. A ¶ 8.

15.    On or about October 12, 2005, the District Court entered an Order for Permanent Injunctive Relief prohibiting BCGI "from making, using, selling, or offering to sell the prepaid wireless service implementations – multi-frequency (MF), common channel signaling system seven (SS7), and pre-intelligent network (pre-IN) – found to infringe Plaintiff Freedom Wireless, Inc.'s patents" ("the Injunction"). Ex. A ¶ 9; Ex. C ¶ 5; Ex. D ¶ 3.

16.    The Injunction further provided "a 'grace period' of 90 days from today's date [October 12, 2005], during which defendants are prohibited from adding any new prepaid

3

customers, for defendants' customers to use the remainder of their prepaid balances and find an alternative carrier." Ex. A ¶ 10; Ex. D ¶ 4.

17.     Because of the "grace period," the injunction had no immediate effect on BCGI's service to its customers and would not have any effect until January 10, 2006, at the earliest.  Ex. D ¶ 5.

18.     On or about October 20, 2005, BCGI noticed an appeal to the United States Court of Appeals for the Federal Circuit.  Ex. A ¶ 11.

19.     On or about November 9, 2005, the District Court denied BCGI's motion to clarify or stay the Injunction.  Ex. A ¶ 12.

20.     On or about November 14, 2005, BCGI filed an emergency motion with the Federal Circuit to stay the Injunction pending the appeal.  Ex. A ¶ 13.

21.     On November 15, 2005, the Federal Circuit temporarily stayed the Injunction. Ex. A ¶ 14.

22.     On December 15, 2005, the Federal Circuit extended the stay for the pendency of the appeal.  Ex. A ¶ 15; Ex. C ¶ 5.

23.     On December 19, 2005, BCGI forwarded an e-mail to Smith Bagley regarding the stay of the Injunction pending its appeal. The December 19 e-mail also included a third-party analyst report titled, "Boston Communications Group, Inc.—A New Lease on Life," which referenced the Federal Circuit's stay of the Injunction during the pendency of the appeal.  Ex. A ¶ 16; Ex. E (Dec. 19 & 20 e-mails).

24.     By e-mail dated December 20, 2005, Smith Bagley's Chief Operations Officer acknowledged receipt of the BCGI communication.  Ex. A ¶ 17; Ex. E.

4

25.     On February 2, 2006, BCGI's Network Operations Center noticed a dramatic drop in telecommunications traffic from Smith Bagley.  Upon inquiry from BCGI, the Smith Bagley switch tech informed the BCGI Network Operations Center that they expected this behavior as they were currently moving facilities to their new prepaid platform.  Ex. D ¶ 6.

26.     In immediate follow-up to the February 2, 2006 Smith Bagley communication, BCGI's Client Relations liaison to Smith Bagley, Tim Quinlivan, spoke with Smith Bagley's Chief Operations Officer, Richard Watkins, to inquire about the drop-off in telecommunications traffic.  Ex. D ¶ 7.

27.     Mr. Watkins responded to the February 2 BCGI inquiry by forwarding a pdf letter to Mr. Quinlivan announcing that Smith Bagley was unilaterally terminating the PCA effective January 31.  The letter claimed that the termination was due to "recent events in your litigation with Freedom Wireless," and attached a copy of the injunction.  Ex. A ¶ 18; Ex. D ¶ 8; Ex. F (Letter from Robert J. Higgins).

28.     On February 3, 2006, counsel for BCGI responded to the termination letter by facsimile and certified mail, reminding Smith Bagley that the injunction was of no effect and requesting that Smith Bagley confirm, within five business days, that it had restored its service relationship with BCGI.  Ex. A ¶ 20; Ex. G (Letter from Alan J. Bouffard).

29.     Smith Bagley replaced BCGI's services with those of VeriSign Inc.  Ex. A ¶ 21; Ex. D ¶ 9.

30.     In July 2006, while the appeal was pending and while the stay of the injunction was still in effect, BCGI and Freedom Wireless entered into a settlement agreement contingent on the trial court's vacatur of the injunction and the judgment against BCGI.  Ex. C ¶¶ 6–7; Ex. D ¶ 10.

31.    As part of the July 2006 settlement, BCGI acquired licenses from Freedom Wireless to use the technology.  These licenses expressly permitted use of the technology by BCGI's customers (including Smith Bagley), partners, and suppliers.  Ex. C ¶ 7; Ex. D ¶ 11.

32.    On October 12, 2006, the District Court vacated the injunction and the judgment against BCGI.  Ex. A ¶ 22.

/s Christopher B. Mead
Mark London (D.C. Bar No. 293548)
Christopher B. Mead (D.C. Bar No. 411598)
1225 19th Street, N.W., Suite 320
Washington, D.C.  20036
(202) 331-3334
*Counsel for Plaintiffs*

Dated: September 28, 2007

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CELLULAR EXPRESS, INC. d/b/a BOSTON
COMMUNICATIONS GROUP AND BOSTON
COMMUNICATIONS GROUP, INC.,

            Plaintiffs,

v.

SMITH BAGLEY, INC. d/b/a CELLULAR ONE
OF NORTHEAST ARIZONA,

            Defendant.

Case:  1:07-cv-00694 (RBW)

## STIPULATION OF MATERIAL FACTS

1.      BCGI is in the business of providing mobile telecommunications billing services.

2.      Smith Bagley is in the business of providing cellular mobile services, as well as network and data services.

3.      On or about March 1, 2000, BCGI and Smith Bagley entered into the Prepaid Connection Agreement ("PCA").

4.      The provisions of the PCA were amended several times between March 2001 and June 2004.  The June 2004 Addendum extended the term of the PCA until March 1, 2009.

5.      In 2000, Freedom Wireless, Inc. filed a patent infringement action in the United States District Court for the District of Massachusetts against BCGI and a number of others (the "Patent Litigation").

6.      On or about May 20, 2005, a jury found that BCGI infringed Freedom Wireless, Inc.'s patented technology.

7.    Following the jury trial, BCGI attempted unsuccessfully through a bench trial on its affirmative defenses and numerous post-trial motions to vacate or reduce the jury verdict.

8.    On or about September 1, 2005, judgment was entered against BCGI.

9.    On or about October 12, 2005, the District Court entered an Order for Permanent Injunctive Relief prohibiting BCGI "from making, using, selling, or offering to sell the prepaid wireless service implementations – multi-frequency (MF), common channel signaling system seven (SS7), and pre-intelligent network (pre-IN) – found to infringe Plaintiff Freedom Wireless, Inc.'s patents" ("the Injunction").

10.    The Injunction further provided "a 'grace period' of 90 days from today's date [October 12, 2005], during which defendants are prohibited from adding any new prepaid customers, for defendants' customers to use the remainder of their prepaid balances and find an alternative carrier."

11.    On or about October 20, 2005, BCGI noticed an appeal to the United States Court of Appeals for the Federal Circuit.

12.    On or about November 9, 2005, the District Court denied BCGI's motion to clarify or stay the Injunction.

13.    On or about November 14, 2005, BCGI filed an emergency motion with the Federal Circuit to stay the Injunction pending the appeal.

14.    On November 15, 2005, the Federal Circuit temporarily stayed the Injunction.

15.    On December 15, 2005, the Federal Circuit extended the stay for the pendency of the appeal.

16.    On December 19, 2005, BCGI forwarded an e-mail to Smith Bagley regarding the stay of the Injunction pending its appeal.

2

17.    By e-mail dated December 20, 2005, Smith Bagley's Chief Operations Officer acknowledged receipt of the BCGI communication.

18.    By letter dated January 17, 2006, Smith Bagley's counsel wrote to BCGI, indicating that "[i]n light of recent events in your litigation with Freedom Wireless," Smith Bagley "has decided that there is no other choice but to pursue a business relationship with another company and terminate our relationship with your company" and terminating the PCA as of January 31, 2006 ("Termination Letter").

19.    At this time, the parties cannot agree on when BCGI received the Termination Letter.

20.    On February 3, 2006, counsel for BCGI responded to the Termination Letter by facsimile and certified mail, noting that the Injunction had been stayed.

21.    Smith Bagley replaced BCGI's services with those of VeriSign Inc.

22.    On October 12, 2006, the District Court vacated the Injunction and shortly thereafter docketed a stipulation of dismissal in the Patent Litigation.

CELLULAR EXPRESS, INC. d/b/a BOSTON
COMMUNICATIONS GROUP AND
BOSTON COMMUNICATIONS GROUP,
INC.,

Respectfully submitted,

LONDON & MEAD

_____/s/_____
Mark London (D.C. Bar No. 293548)
Christopher B. Mead (D.C. Bar No. 411598)
1225 19th Street, N.W., Suite 320
Washington, D.C.  20036
(202) 331-3334
Counsel for Plaintiffs

SMITH BAGLEY, INC. d/b/a
CELLULAR ONE OF NORTHEAST
ARIZONA,

Respectfully submitted,

HOLLAND & KNIGHT LLP

_____/s/_____
Leo G. Rydzewski (D.C. Bar No. 459979)
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006
(202) 955-3000
(202) 955-5564 – fax
Counsel for Defendant

James D. Smeallie (*admitted pro hac*)
Elizabeth M. Mitchell (*admitted pro hac*)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated:  August 29, 2007

# 4763302_v2

4

# EXHIBIT B

# Prepaid Connection Agreement

Between

**Cellular Express, Inc. d/b/a Boston Communications Group**

and

**Smith Bagley, Inc. d/b/a CellularOne of Northeast Arizona**

This agreement ("Agreement") is made and is effective as of _March 1_____, 2000 between Cellular Express, Inc. d/b/a Boston Communications Group, a Delaware corporation ("BCGI"), and Smith Bagley, Inc., a Washington D.C. corporation d/b/a/ Cellular One of Northeast Arizona, ("Customer").

## 1.     SCOPE OF AGREEMENT

BCGI is a provider of prepaid wireless systems and services to wireless telecommunications carriers. Customer is a wireless telecommunications carrier who wished to purchase BCGI's Prepaid Connection Product. The Prepaid Connection product consists of equipment, software and services as described in Exhibit 1 of this Agreement.

BCGI agrees to sell and install the equipment described in the Exhibit 2 of this Agreement ("Equipment"), to license the use of the identified software in Exhibit 2 ("Software"), and to provide the support services ("Technical Services") described in Exhibit 3 of this Agreement, Technical Services. Customer agrees to purchase and to pay for such Equipment, Software, Technical Services and services according to the terms and conditions in this Agreement. The terms and conditions of this Agreement supersede and replace any terms and conditions in Customer's purchase order(s) or any other agreements between BCGI and Customer. BCGI shall not be bound by any terms of Customer's purchase order(s) that are inconsistent with or additional to the terms of this Agreement.

## 2.     CHARGES AND PAYMENT TERMS

**a.     Purchase Price.** The Purchase Price for the Equipment, Software, and services is stated in Exhibit 2. The Purchase Price includes the license to use the Software.

**b.     Installation charges.** The Installation charge for setting up and placing into service the Equipment and/or Software, and for the training and documentation is stated in Exhibit 2.

**c.     Technical Service Charges.** The Technical service charges for providing technical services for the equipment and the software is stated in Exhibit 2 and in Exhibit 3

**d.     Additional Equipment Purchases.** Additional equipment purchases is stated in Exhibit 2.

**e.     Terms of Payment.** Customer shall make payments according to the following terms:

(i) Equipment Purchase. Customer shall pay BCGI the Equipment price as outlined on Exhibit according to the payment terms set forth therein.

(ii) Recurring Usage Fees. BCG shall invoice Customer on or about the first day of each month for the previous month. This invoice shall be in an amount equal to the greater of (i) the minimum usage charges for the month, or (ii) the actual usage charges during the month.

(iii) Other Charges. Customer shall pay BCGI for other charges as outlined on Exhibit 2.

(iv) Late Charge. Customer accounts that are not paid in accordance with the terms above stated will be subject to a late charge of 1.5% per month (18% per year) or the maximum lawful rate, whichever is less, to cover the cost of servicing the account

(v) U.S. Dollars. All charges are quoted in and to be paid in U.S. dollars. All invoices are net 30 unless specifically stated otherwise.

3.  **TERM**

This Agreement shall begin upon execution and shall continue for two years. This Agreement shall automatically renew for additional two year periods and Customer will be required to pay the fees for Technical Services/Maintenance for such renewal terms.. Customer may give notice of non-renewal at least 120 days prior to the end of the term.

4.  **ORDERS**

a.      **Order Acceptance.** Each order placed under this Agreement is subject to BCGI's acceptance, which shall not be unreasonably withheld. If accepted, BCGI will deliver to Customer a Notice of Acceptance of each order at the address stated in the "bill-to" section of the relevant Order Schedule within 15 business days after receipt of Customer's signed hard copy purchase order referencing an Order Schedule. BCGI's Notice of Acceptance shall identify the items to be delivered, the price, and the Scheduled Delivery Date(s).

b.      **Change Orders.** Any written request from Customer for a change to an order previously accepted by BCGI may subject Customer to a price change reflecting the inclusion or substitution of items and/or BCGI's direct costs of handling the requested change. A change in an accepted order may also result in a change in the Scheduled Delivery Date. A written acceptance by BCGI of a change order will specify any price or delivery changes. Change orders reflecting deletions are subject to Section C below. In the event that, within 10 business days of the Scheduled Delivery Date, Customer notifies BCGI that it wishes to extend the Scheduled Delivery Date of the Equipment by more than 10 business days, Customer shall pay a rescheduling fee equal to 10% of the Installation Charge or $5000, whichever is lower.

c.      **Cancellation.** Customer does not have the right to cancel the purchase of the items being ordered under this Agreement after the date of shipment by BCGI, except as specified elsewhere in this Agreement. Accepted orders or portions of accepted orders canceled within 30 days prior to the Scheduled Delivery Date shall be subject to a cancellation charge equal to 15% of the Equipment Price of the canceled items. Accepted orders or portions of accepted orders canceled between 30 and 90 days prior to the Scheduled Delivery Date shall be subject to a cancellation charge equal to 10% of the Equipment Price of the canceled items.

d.      **Expedited Orders.** BCGI will use best efforts to deliver accepted orders within its standard lead times. Customer may request delivery inside of BCGI's standard lead times subject to an expedite surcharge to be determined by BCGI and subject to BCGI's ability to deliver such orders within the requested time period.

5.  **SHIPMENT, DELIVERY AND INSTALLATION**

a.      **Shipment.** Shipment will be made in accordance with the Scheduled Delivery Date specified in BCGI's Notice of Acceptance. In the absence of specific shipping instructions from Customer, BCGI may ship by the method it deems most advantageous to both parties. Equipment will be packaged in BCGI's standard commercial packaging. If special packaging is requested, or in BCGI's opinion is required, these additional packaging costs will be invoiced to and paid by Customer.

b.    **Delivery.** Delivery will be to a shipping area at BCGI's Premises, FOB Shipping Point. The Delivery Date shall be the date that the common carrier or other delivery service takes possession of the ordered goods at BCGI's Premises. Title and risk of loss shall pass to Customer on the Delivery Date. Customer shall then be responsible for and bear the entire risk of loss or damage to the Equipment and Software.

BCGI reserves the right to extend the Scheduled Delivery Date by up to 30 days upon prior written notification to Customer at least 30 days prior to the Scheduled Delivery Date.

c.    **Installation.** BCGI shall utilize its own personnel to perform installation or may delegate the performance of portions of installation activity to a third party and shall be responsible for the acts of any such third party. The Installation Date is the date that the System is ready for testing and/or use by Customer. If the order consists only of additional Equipment or Software, the Installation Date is the date that the additional items are installed in an existing System. The standard Installation Charges are quoted on the Order Schedules. If Customer reschedules the Installation Date within 30 days of the scheduled Installation Date there will be a rescheduling fee of 10% of the total Installation Charge.

The items ordered will be installed at Customer's premises identified in the "Ship to" designation ("Premises") on the Order Schedule(s).

6.    **TERMINATION**

BCGI shall have the right to cancel any order and recover any goods in transit or at Customer's Premises if Customer fails to perform Customer's obligations hereunder any of the material terms and conditions of this Agreement and fails to remedy such breach within 30 days after notice thereof; or if Customer's delay directly causes material delay to BCGI's performance of this Agreement; or if any bankruptcy or insolvency proceedings are commenced by or against Customer and such proceedings are not dismissed within 30 days; or in the event of the appointment of any assignee for the benefit of creditors or of a receiver of Customer or its properties.

7.    **TRAINING.**

Customer will select an employee to act in the capacity of System Manager. BCGI will train the System Manager in methods and procedures to effectively use the Equipment and Software. This training will be conducted during the installation process thereby requiring the System Manager be present during the installation period. Additional training will be made available for other customer delegated participants at either an onsite training session or a training session at a BCGI facility. The prices for either of these training sessions will be quoted as requested. Other training and documentation may also be ordered separately from BCGI at then current prices.

8.    **CUSTOMER RESPONSIBILITIES**

a.    **Access.** Customer will provide BCGI full and free access to the Equipment during mutually agreed to times and waiver of liability and other restrictions will not be imposed as a requirement for access to the Premises. Customer will allow BCGI to use necessary machines, communications facilities, features, and other equipment at no charge. A

representative of Customer will be present at the Premises during the performance of installation and support.

b. **Condition of Premises.** Customer will maintain the conditions of the Premises within the common environmental range of and in accordance with the power, temperature, humidity, and other requirements for the Equipment as set forth in Exhibit 5.

c. **Telecommunications Facilities.** Customer will complete, sign and return the Pre-Install Checklist which outlines the required telecommunications and other site conditions.

d. **Call Screening.** Customer is required to route all unregistered and "authorization denied" traffic to the Prepaid Connection Node for processing.

## 9. SOFTWARE PRODUCTS RESTRICTION

Customer is granted a personal, nontransferable, non-exclusive, license to use, for the term of this Agreement, for its internal business purposes only in connection with the Equipment, only the number of copies of such Software that are provided by BCGI and only on the Equipment on which it is originally loaded, installed, or mounted by BCGI. Customer may not copy (except a reasonable number of copies for backup or archival purposes) such Software for any purpose without BCGI prior written consent. Customer may not remove such Software or attempt to execute such Software on any equipment other than the Equipment on which such Software was originally loaded, installed or mounted by BCGI.

Customer shall not, whether through the use of disassemblers or any other means, attempt to reverse engineer, decompile, disassemble, or derive, any source code from such Software, nor shall Customer permit any third party to do so. Customer shall not cause such Software to be destroyed, disabled, or modified in its operation. Any attempt to perform any of the foregoing shall be a material breach of this Agreement and shall entitle BCGI to immediately exercise any remedy herein or available by law or in equity.

Customer may not resell or otherwise transfer the Software without BCGI's prior written consent that shall not be unreasonably withheld..

The provisions of this Section shall survive the termination of this Agreement.

## 10. WARRANTIES AND WARRANTY SERVICE

BCGI's warranties with respect to the Equipment and Software are contained in the Limited Warranty contained in Exhibit 4 attached hereto and incorporated herein by reference.

BCGI shall use commercially reasonable efforts to respond to requests for warranty service during the warranty term.

These warranties are contingent upon Customer's proper use and service in applications for which the Equipment was intended and shall not apply to damage caused by abuse, misuse, alteration, neglect, or unauthorized repair or installation, or by the use or attempted use of software or hardware other than that supplied and supported by BCGI. Replacement of Equipment does not extend its warranty period beyond the original warranty expiration date. These warranties do not cover reconstruction of Customers configuration or other data files residing on the Equipment or Software that was rendered inoperable or

inconsistent through the attachment of non-BCGI equipment or application of Customer's independently developed procedures or software.

THE WARRANTIES SET FORTH HEREIN ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, WITH RESPECT TO THE EQUIPMENT, SOFTWARE, SERVICES OR OTHER ITEMS PROVIDED HEREUNDER. BCGI SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## 11.  PLANT RULES AND SECURITY REQUIREMENTS.

The employees and agents of each party, shall while on the premises of the other, comply with all plant rules and regulations in effect at such premises, including security requirements.

## 12.    TAXES.

All amounts payable to BCGI are exclusive of all taxes, levies or similar governmental charges, however designated, including penalties and interest ("Taxes") imposed by any jurisdiction which shall be paid by Customer, including but not limited to those based on gross revenue, payments under this Agreement, the execution or performance of this Agreement, or otherwise, except for Taxes based on the net income of BCGI. If any such Taxes are required to be withheld, Customer will pay an amount such that the net amount after withholding of Taxes shall equal the amount that would have been otherwise payable under this Agreement. Customer agrees to pay all Taxes which are properly payable or to provide BCGI with a certificate of exemption ("Certificate"), acceptable to the appropriate taxing authority, with respect to the unpaid Tax. Where required, such Certificates will be provided prior to the shipment of goods under this Agreement. Customer shall provide BCGI with official tax receipts or other evidence of the payment of any Tax required to be withheld on behalf of BCGI under this Agreement.

Carrier is also responsible for all remittance, collection and payment of all taxes on the services provided to end subscribers of the service.

## 13.    SECURITY INTEREST.

Customer grants to BCGI a purchase money security interest in the Equipment, in all of Customer's right, title and interest in the Software, and in the proceeds, including insurance proceeds and products thereof in any form, to secure payment of the Purchase Price, Installation Charges, Shipping Charges, and taxes relating to such Equipment and Software. In the event of default by Customer of any of its payment obligations to BCGI under this Agreement, when such default has not been cured within 30 days from the date of the default, BCGI shall have the rights of a secured creditor under the Uniform Commercial Code, including but not limited to the right to repossess the Equipment and Software without liability to Customer. In such event, Customer agrees to make the Equipment and Software available to BCGI so that BCGI can repossess it without a breach of the peace. Customer agrees to execute such documents as BCGI shall reasonably require to perfect its security interest. A copy of this Agreement or the relevant invoice(s) may be filed with the appropriate authorities at any time as a financing statement in order to perfect BCGI's security interest. Customer hereby authorizes BCGI or its authorized agent to sign and execute on its behalf any and all necessary UCC-1 forms to perfect BCGI's purchase money security interest for all transactions covered by this Agreement. The provisions of this Section 16 shall survive termination of this Agreement.

**14.    PATENT AND COPYRIGHT INDEMNITY.**

BCGI will defend or settle at its expense any action brought against Customer to the extent based upon a claim that the Equipment or Software purchased or licensed and paid for by Customer infringes any duly issued United States patent or copyright, and BCGI shall pay any settlements entered into or final judgments awarded to the extent based thereon; provided that BCGI shall have sole control of any such action or settlement negotiations, and provided further that Customer notifies the General Counsel of BCGI promptly in writing of such claim, suit, or proceeding and gives BCGI adequate information and uses its best efforts to assist in the settlement and/or defense of any such action.

If Customer's Equipment or Software becomes, or in BCGI's opinion may become, subject to any claim of infringement of any duly issued United States patent or copyright, BCGI at its option may:

(i)     procure for Customer the right to continue to use the Equipment or Software,
(ii)    replace or modify the Equipment or Software so that it is non-infringing; or
(iii)   if neither of the foregoing alternatives is reasonably practical, BCGI may remove the Equipment or Software and refund the applicable Purchase Price and Installation Charge payments made to BCGI, reduced by an amount equal to the depreciated portion of the payments, calculated on a five (5) year straight line basis.

BCGI shall not be liable for any costs or expenses incurred by Customer or on Customer's behalf without prior written authorization by an officer of BCGI. BCGI specifically disclaims any liability for claims relating to non-BCGI systems, equipment, software, assemblies, circuits, methods or processes into which Equipment or Software provided by BCGI is incorporated, or for or with which any of the Equipment or Software provided by BCGI is used. BCGI specifically disclaims any liability under this Section 18 relating to the creation or modification of Equipment or Software in compliance with Customer's specifications or for Customer's modification of Equipment or Software unless such modification was made with BCGI's prior written approval.

THE FOREGOING STATES THE SOLE AND EXCLUSIVE LIABILITY OF BCGI AND THE EXCLUSIVE REMEDY OF CUSTOMER FOR INFRINGEMENT OR CLAIMS OF INFRINGEMENT OF ANY THIRD PARTY PATENT, COPYRIGHT, OR OTHER INTELLECTUAL PROPERTY RIGHT BY THE EQUIPMENT OR SOFTWARE.

**15.    CONFIDENTIAL INFORMATION.**

Any information of a party which is confidential or proprietary, specifically including, but not limited to, technical and business plans, data, business information, technical information, specifications, drawings, sketches, computer programs and documentation, processes, services and like information, written, oral or otherwise (all hereafter designated "Information") furnished to a party hereunder or in contemplation hereof shall remain the property of the disclosing party. Both parties hereby agree to receive such Information and to disclose such Information only subject to the following terms and conditions:

a.      Each party agrees to protect such Information provided to the other from whatever source from distribution, disclosure or dissemination to anyone except employees of the respective parties with a need to know such Information in conjunction with the provision of the above services, except as authorized herein or as otherwise authorized in writing by the parties. Each party will use, at a minimum, the same standard of care to protect such Information as it uses to protect its own similar confidential and proprietary information.

b.    Neither party will have an obligation to protect any portion of the Information which:

    i)    is made publicly available by the disclosing party or lawfully by a third party;

    ii)   is lawfully obtained by a party from any source other than from the disclosing party; or

    iii)  is previously known to the receiving party without an obligation to keep it confidential.

c.    A party may disclose Information which is requested by a court of competent jurisdiction to such court, provided the party shall give reasonable notice to the disclosing party and shall cooperate with the disclosing party in seeking protection from the disclosure of such Information.

d.    Each party agrees to use the Information of the other solely in conjunction with the purpose for which it was disclosed and for no other purpose. Each party will only make such copies of the Information received from the other as are necessary for its use under the terms hereof, and each such copy will be marked with the same proprietary notice as appears on the original. Upon the termination of this Agreement or the request of a disclosing party, the other party will return all Information previously received in tangible form from the disclosing party and all copies thereof and notes prepared therefrom, or at the request of the disclosing party shall destroy the same and provide a signed statement certifying the destruction thereof. No Information of a disclosing party shall be retained by the other party after the termination of this Agreement.

e.    The parties agree not to identify each other or any other owner of information disclosed hereunder in any advertising or publicity without prior written permission of the disclosing party.

f.    The provisions hereof shall continue for a period of two years following termination of this Agreement. In any event, however, the obligations of each party to maintain the confidentiality of the Information it has received under this Agreement shall continue indefinitely as to Information constituting a trade secret under applicable law.

g.    No license to a party under any trademark, patent or copyright is either granted or implied by the disclosure of Information to such party.

h.    Each of the parties acknowledges and confirms that any failure on its part to adhere strictly to the terms and conditions of this Section is likely to cause substantial and irreparable injury to the other party. Accordingly, each party confirms and agrees that, in addition to all other remedies to which the other party may be entitled under this Section at law or in equity, the other party shall be entitled to specific performance and other equitable relief, including temporary and permanent injunctive relief to enforce the provisions of this Section.

16.    **LIMITATION OF LIABILITY**

IN NO EVENT SHALL BCGI'S LIABILITY UNDER, ARISING OUT OF OR RELATING TO THIS AGREEMENT INCLUDING OBLIGATIONS UNDER SECTION 17, EXCEED THE AMOUNT PAID TO BCGI BY CUSTOMER FOR THE EQUIPMENT, SOFTWARE, OR SERVICES GIVING RISE TO

SUCH LIABILITY. IN NO EVENT WILL BCGI BE LIABLE FOR LOST PROFITS, LOSS OF USE, LOSS OF DATA, COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, UNAUTHORIZED CALLS THAT MAY BE MADE USING THE SYSTEM AND CHARGED TO CUSTOMER, ANY TELEPHONE TOLL FRAUD, OR ANY OTHER SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES, HOWEVER CAUSED, AND ON ANY THEORY OF LIABILITY, WHETHER FOR BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), OR OTHERWISE. THESE LIMITATIONS SHALL APPLY WHETHER OR NOT BCGI HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. THE PARTIES ACKNOWLEDGE THAT THE PURCHASE PRICE WAS DETERMINED BASED UPON THE FOREGOING LIMITATION OF LIABILITY.

17.    **OTHER TERMS AND CONDITIONS**

    a.    **Assignment and Subletting.** Except as otherwise provided herein, Customer may not sublet or assign the Equipment and Software or any part thereof, or Customer's interest in this agreement without the express, written consent of BCGI, provided however, that Customer may, without BCGI's consent, transfer or assign the BCGI and/or Customer's interest in this Agreement in conjuction with the sale by Customer of it's business or the sale of transfer by Customer of all or substantially all of its assets.  Customer shall include a provision in its sales contract that the buyer shall acknowledge acceptance of this Agreement and that Buyer's use of the Equipment and Software is subject to the terms and conditions of this Agreement prior to close of sale.

    b.    **Severability.** If any provision, or portion thereof of this Agreement is invalid under applicable statute or rule of law, it is only to that extent to be deemed omitted, and such unenforceability shall not affect any other provision of this Agreement, but this Agreement shall then be construed as if such unenforceable provision or provisions had never been contained herein.

    c.    **General Terms.** This Agreement shall be governed by the laws of the Commonwealth of Massachusetts, without reference to its conflict of laws rules. Clerical errors are subject to correction. Customer grants BCGI permission to obtain, from any source, information related to Customer's credit rating. If Customer is not a public company, Customer agrees to supply to BCGI financial information requested by BCGI for the purpose of verifying credit and to warrant the accuracy of such information. Except for Customer's obligation to pay amounts due, a party hereto shall not be liable for any loss, damage, or penalty resulting from such party's failure to perform or delay in performing its obligations hereunder when such failure or delay is beyond its control and without its fault, including, without limitation, changes in government regulations, embargoes, epidemic, war, terrorist acts, riots, insurrections, fires, explosions, earthquakes, nuclear accidents, floods, strikes, power blackouts, severe weather conditions, failure by the other party to fulfill any of its obligations under this Agreement, acts of third parties, or acts or omissions of common carriers.

    d.    **Entire Agreement.** This Agreement constitutes the entire agreement between BCGI and Customer with respect to the subject matter hereof and supersedes any previous agreements or representations, either oral or written. Customer acknowledges that it has not relied upon any representations or warranties other than those expressly contained in this Agreement. This Agreement may be amended, terminated, or altered only by an

instrument in writing signed by individuals of appropriate authority of both parties. Customer shall not assign this Agreement or any rights hereunder, except to a financing company as stated in Section 3, without prior written consent from BCGI.

e.    **Notice.**  Any notice to be given hereunder by either party to the other shall be in writing and shall be deemed given when sent by postage prepaid certified United States mail.

Notices to BCGI shall be addressed to:    Notices to Customer shall be addressed to:

Boston Communications Group, Inc.          Smith Bagley, Inc.
100 Sylvan Road                            1500 South White Mountain Road
Woburn, MA 01801                           Show Low, AZ 85901
Attn: General Counsel                      Attn: Legal Dept.

If either party changes its address during the term hereof, it shall so advise the other party in writing and any notice thereafter required to be given shall be sent to such new address in the manner set forth above.

f.    **Binding Agreement.**  This Agreement shall be binding upon both parties and their respective and assigns.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first written above.

Cellular Express, Inc.                     Smith Bagley, Inc.
d/b/a Boston Communications Group

By _____              By _____

Name: _____              Name: RICHARD WATKINS

Title: _____              Title: GM

# EXHIBIT 1

## Prepaid Connection

**Description of Prepaid Connection**

The BCGI Prepaid Connection will allow the Customer to offer prepaid wireless service to their subscribers and take advantage of the Prepaid Wireless features and the national network for roaming. Customers purchase the hardware configured for the needed prepaid subscriber capacity as stated by the Customer. The hardware has BCGI software for call processing and digit collection from the Customer's prepaid subscribers and from roaming subscribers. This hardware and software (the "Prepaid Connection Node") is installed at Customer's location by BCGI personnel. Customer is responsible for provisioning and maintaining a data connection from the Prepaid Connection Node to a BCGI central Prepaid Connection server complex. BCGI is responsible for a data connection from the Prepaid Connection server complex to BCGI's C2C server complex to allow national roaming.

Customer is required to route all unregistered and "authorization denied" traffic to the Prepaid Connection Node for processing. BCGI's Roamerplus Service provides call processing, completion and billing services for roamers who are not allowed automatic roaming in the Customer's service area and are routed through the Prepaid Connection Node.

Customer provides customer care to their subscribers utilizing BCGI's web based care software which is part of the Prepaid Connection Service.

Customer is responsible for providing first level troubleshooting and technical support for the Prepaid Connection Node. BCGI will provide second level troubleshooting and technical support for the Prepaid Connection Node as outlined in Exhibit 3 Technical Services at the fees outlined in Exhibit 2.

**EXHIBIT 2**

**Order Schedule**

**REDACTED**

## EXHIBIT 2

### Order Schedule

(A)  System Price
Customer agrees to pay BCGI         US Dollars for the following equipment:

| Equipment List: | |
|---|---|
| Rack Adapter 19" Flush Mount | 2 |
| Keyboard/Monitor shelf Grey | 1 |
| Mouse | 1 |
| Monitor | 1 |
| Monitor Shelf | 1 |
| Modem Shelf | 1 |
| Keyboard Drawer | 1 |
| 4 position Switchbox & cables | 1 |
| Trimm  Fuse Panel | 1 |
| Vented Filler Panel | 2 |
| Logo Filler Panel | 1 |
| Ground Bar Kit | 1 |
| Modem 56k external | 2 |
| Cat 5 Cables 7ft | 3 |
| Terminals | 5 |
| Fuses 10 Amp GMT | 4 |
| Cabinet 6' EIA | 1 |
| Cabinet mounting Kit | 1 |
| AC Power Strip 19" EIA mount | 1 |
| Misc Screws.... | 1 |
| Ethernet HUB 10BaseT Rack Mount | 1 |
| Cisco Ethernet Router FRw/ISDN Bkup | 1 |
| Null Modem Cables 6' DB9F/DB9F | 2 |
| Shipping container | 2 |
| | |
| TIN 5 g/g IDE 128 meg ram peak 520 | 1 |
| Spare TIN 5 g/g IDE 128 meg ram peak 520 | 1 |
| | |
| T1's D240 | 0 |
| Spare T1's D240 | 0 |
| T1's D480 | 1 |
| Spare T1's D480 | 1 |
| | |
| SS7 cards (optional) | 0 |
| Spare SS7 cards (Not optional if you get above card) | 0 |

(B)  Implementation  Charge                                    $0
Installation  date will be determined based on the customer's readiness (i.e. the return of the pre-install checklist)
and the current implementation schedule.

(C)  Service & Support
Service & Support charges are 15% of purchase price.
The Service Agreement/Maintenance period begins 90 days from the original ship date and
renews each year thereafter.

(D)  MOU Pricing

MOU's will be calculated on calendar months.
If the system is implemented mid-month the MOU's
will be billed for the partial month against the table
listed and the calculation of MOU's will begin on the
first of the next month for the next billing cycle.
MOU's will be extracted from the database.

| MOU's From | MOU's To | Price Per Minute |
|---|---|---|
| - | 5,000 | $ |
| 5,001 | 50,000 | $ |
| 50,001 | 100,000 | $ |
| 100,001 | 150,000 | $ |
| 150,001 | 250,000 | $ |
| 250,001 | 500,000 | $ |
| 500,001 | + | $ |

Prepaid Card PINs

| First 1,000 included | $ |
|---|---|
| Lots of 1,000 | $ |
| Lots of 10,000 | $ |

**REDACTED**

(E)  Terms

*Equipment Purchase*
50% with order remaining 50% prior to commercial service.

*MOU's*
Net 30 from invoice date.

*Implementation Fees*
Due 30 days prior to installation.

*Support/Maintenance Agreement*
Payment due prior to commercial service or 30 days prior to renewal date.
Renewal date is 15 months from date of shipment.
Includes 5000 MOU's free per month and 24X7 remote support.

**Terms and Conditions:**

☐ Call Screening is included in each Prepaid Connection Installation and requires the carrier to forward all unregistered and
"authorization denied" traffic to the Prepaid Connection Remote Service Node.
☐ All unregistered roaming calls will be completed via BCGI ROAMERplus service, commissioned at a rate of $ .  /minute.
☐ Fee for maintenance for the first year of service is required at contract signing and is non-refundable.
☐ To continue with BCGI Prepaid Connection service after the end of the second year, the maintenance service contract extension is required.
☐ Up to two distinct rate plans and four international dialing country code rates may be set up with no additional charge at the time of installation.
Additional rate plans must be provisioned through BCGI and will incur an additional charge of $   /hr. for implementation.
☐ Access to the BCGI C2C network for outbound roaming calls via the BCGI Call Screening capability and via the ROAMERplus network is included.
☐ PINs must be ordered through BCGI in lots of 1,000 or 10,000.
☐ All telecommunications costs are the responsibility of the customer.
☐ The above stated prices exclude any applicable taxes, including but not limited to GST, VAT, sales, and/or duties or country specific imposed fees.
All taxes are the responsibility of carrier.
☐ BCGI is not responsible for bad debt or uncollectibles associated with prepaid revenue.
☐ Other services/features will be quoted upon request

**Equipment and Implementation Fee Includes the following:**
☐ Equipment purchased by carrier at carrier site
☐ Project Management
☐ Table setup for Country codes and rates for two initial rate plans and four country codes
☐ Initial training
☐ Testing Labor & Travel

**Equipment and Implementation Fee Does Not Include the Following:**
☐ Modification of s/w for required signaling string changes @ $125/hour
☐ All costs associated with the data connections from the Remote Service Node to the BCGI Central Server Complex for call processing
and customer care access are the carrier's responsibility.
☐ Additional equipment requests will be quoted on request
☐ Shipping costs for RMA's are the responsibility of carrier
☐ Any delays in implementations as a result of carrier delays may result in additional fees.

**Monthly MOU Recurring Fee Includes the Following:**
☐ Standard reporting, data table maintenance and product support
☐ BCGI standard software maintenance and releases

## EXHIBIT 3

### Technical Services

**1. Technical Services**

BCGI will provide technical troubleshooting assistance services as described in this Exhibit 3 (hereinafter referred to as "Technical Services") at the prices as outlined on Exhibit 2. Technical Services shall include BCGI's best efforts to verify and correct any errors or failures (inability of BCGI's hardware, firmware or software to conform to the BCGI's published specifications) in an unaltered version of the BCGI software, which are detected by BCGI or reported by the Customer to BCGI. This Agreement addresses troubleshooting and maintenance only, and does not include on-site technical assistance, except as described in section 4, Billing. BCGI has no responsibility for providing technical troubleshooting assistance for errors or failure of systems not supplied by BCGI. Customer is solely responsible for providing such services for its own equipment, telecommunications facilities and connections into the Prepaid Connection service.

**2. Disclaimer and Exclusions from Assistance**

BCGI shall have no obligation to perform Technical Services under the following conditions:

(1)             Any changes or modifications made to software, firmware or hardware that do not comply with BCGI published specifications (said modifications do not include routine database administration changes or the associated hardware assignments).

(2)             Customer uses software in an unauthorized manner that is not in accordance with the published specifications, instructions or license of the BCGI.

**3. Technical Service Times and Procedure**

This Agreement provides for Technical Services on a 24 hours a day, seven (7) days a week basis via pager callback. Customer will be contacted within 30 minutes from the time the page was received, either to help troubleshoot or receive more information from the Customer. During business hours (Monday – Friday from 8 AM ET to 6 PM ET except holidays), the Customer may call BCGI directly for Technical Services.

All Technical Service calls will be assigned a trouble ticket number. The next available Technical Service technician will be assigned to the trouble ticket.

This service provides remote dial-in support via modem, as well as telephone support to assist with the diagnosis and correction of any problems reported by Customer to the Technical Services organization of Boston Communications Group.

There is no restriction on the number of calls or the hours per month for Technical Services rendered under this agreement.

REDACTED

### 4. Billing

The applicable rates for On-Site Technical Service are $| /hour. Those rates will remain unchanged for a period of one year following the execution of the Prepaid Connection Agreement. All charges are exclusive of applicable federal, state or local taxes. Customer shall pay or reimburse BCGI for any travel and expenses, applicable taxes. BCGI will bill Customer for all charges as incurred. Customer agrees to pay BCGI for all invoices received, within thirty (30) days of the date such invoice is received. BCGI may assess a late charge of $ USD or 1.5% per month whichever is higher for any late payment.

### 5. Customer Responsibilities

Customer shall perform initial trouble shooting as described in the system documentation and training session. This includes, but is not limited to, T-1 and data connection verifications, system monitoring, and hardware functions and replacement with spares if needed.

Customer shall provide BCGI with access to the system by modem in order for BCGI to perform Technical Services. Customer is responsible for providing a telephone line for the system modem. Customer shall provide reasonable cooperation and assistance to BCGI in order to facilitate the Technical Services requested. Customer shall provide documentation, as requested by BCGI, for the product and/or any connecting equipment associated with the product being supported, in order for BCGI to fulfill the necessary Technical Service requirements.

## EXHIBIT 4

### Limited Warranty

### Overview

Please read the following terms and conditions before using Prepaid Connection. Use of the system signifies your acceptance of the following Limited Hardware and Software Warranties.

### Limited Hardware Warranty

BCGI warrants the "Equipment" exhibit II for a period of 365 days after shipment, Prepaid Connection hardware will be free from defects in workmanship or material under normal use and service. The Prepaid Connection hardware must be plugged into a functioning Uninterruptible Power Supply (UPS), which provides battery back-up and surge/spike protection, or the warranty is voided.

The obligation of BCGI under this warranty does not arise until Customer returns the product to BCGI Systems Division headquarters in Tulsa, Oklahoma, or to an authorized BCGI distributor. Upon receipt, BCGI shall, at its option, repair or replace without charge any defective component part of such product and return the product, shipping prepaid and billed.

### Limited Software Warranty

BCGI warrants that each software application of Prepaid Connection shall conform to the current published documentation applicable to such program. For a period of 365 days from the date the Prepaid Connection software is installed, BCGI or its authorized distributor will resolve or provide a solution for software faults at no charge to Customer, providing Customer has documented the symptoms of the fault. This warranty will not apply to problems that cannot be replicated by BCGI.

## Limitation of Liability

THE WARRANTY OBLIGATIONS OF BCGI SHALL IN NO EVENT INCLUDE ANY WARRANTY OF MERCHANT ABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, RESPONSIBILITY FOR DAMAGE RESULTING FROM ACCIDENT, TRANSPORTATION, NEGLECT OR MISUSE, MODIFICATION WITHOUT BCGI'S PRIOR CONSENT, UNATHORIZED ATTEMPTS TO REPAIR, OR FAILURE OF ELECTRICAL POWER OR ENVIRONMENTAL CONTROL.

IN NO EVENT WILL BCGI OR ITS DISTRIBUTERS BE LIABLE FOR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTAL DAMAGES RESULTING FROM CUSTOMER'S USE OR INABILITY TO USE THE PRODUCT, BASED UPON ANY DEFECT IN THE PRODUCT OR ITS DOCUMENTATION, EVEN IF BCGI HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN PARTICULAR BCGI SHALL HAVE NO LIABILITY FOR THE LOSS OF ANY INFORMATION CONTAINED WITHIN THE SYSTEM AT ANY TIME.

THE MAXIMUM LIABILTY BCGI FOR ANY CLAIM, INCLUDING BUT NOT LIMITED TO BCGI'S NEGLIGENCE, SHALL BE LIMITED TO THE REPAIR OR REPLACEMENT OF THE DEFECTIVE PRODUCT.

## Warranty Summary

The warranty and remedies set forth in this document are exclusive and in lieu of all others, oral or written, expressed or implied. No BCGI dealer, distributor, agent or employee is authorized to make any modification, extension or addition to this warranty.

## Contact Information

Please address all correspondence regarding warranty to:

Boston Communications Group Systems Division
621 East Fourth Street
Tulsa, OK 74120-3017
USA
ATTN: Terry Hare

(918) 582-8781 (Phone)
(918) 582-8782 (Facsimile)

**REDACTED**

## EXHIBIT 4

## Distribution Technology Partner (DTP) Transactions

Customer wishes to implement the Remote Transaction Server for use with the Distribution Technology Partner Program.

| Pricing | |
|---|---|
| **Length of Agreement** | 12 months |
| **Implementation Fee** | $▓ |

| Monthly Usage Fee | | |
|---|---|---|
| **Min. Transactions** | **Max. Transactions** | **Transaction Fee** |
| 0 | 1,000 | $▓ |
| 1,001 | 2,500 | $▓ |
| 2,501 | 5,000 | $▓ |
| 5,001 | 10,000 | $▓ |
| 10,001 | 20,000 | $▓ |
| 20,001 | 50,000 | $▓ |
| 50,001 | 100,000 | $▓ |
| 100,001 | 250,000 | $▓ |
| 250,001 | 500,000 | $▓ |
| 500,001 | 750,000 | $▓ |
| 750,001 | + | $▓ |

*Additional Information:*

- There is a minimum monthly charge of $▓ per month when there is less than $▓ worth of transactions.
- The minimums will begin in the first month of the program.
- The transaction pricing is only applicable for the use of RTS in conjunction with distribution partners. Additional fees may apply if RTS will be used for additional applications (implementation fee, etc).
- Transaction fees will be invoiced monthly. Invoices are due net 30 days.
- A deposit may be required.

*Transaction Fees include the following:*

- Shared RTS server
- Use of Hardware and Software of RTS solution
- 7*24 NOC support
- Basic reporting of transactions (peg count only) on a monthly basis
- Account Management and Other Operational Support

*Terms and Conditions of DTP Program:*

- Carrier hereby authorizes access to its subscriber accounts via RTS by the DTP(s).
- Carrier is responsible for all activities performed on Carrier's subscriber accounts by the DTP(s).
- Carrier is responsible for ensuring the confidentiality of Carrier information delivered to DTP, and BCGI shall have no obligation to enforce the confidentiality of such information.
- BCGI, its affiliates and their officers, directors and employees are not liable for any damages, penalties, claims, suits, causes of action, costs or expenses resulting from any action or omission of the DTP(s), its officers, employees or agents.

**REDACTED**

## ADDENDUM TO PREPAID CONNECTION AGREEMENT

This Addendum to Prepaid Connection Agreement is made this _____ 30th _____ day of March, 2001, by and between Cellular Express, Inc. d/b/a Boston Communications Group ("BCG") and Smith Bagley, Inc. d/b/a CellularOne of Northeast Arizona ("Carrier").

WHEREAS BCG and Carrier entered into an agreement, dated March 1, 2000, (the "Agreement") for the sale of equipment and provision of services by BCGI to Carrier; and

WHEREAS, the parties desire to modify that Agreement;

NOW, THEREFORE, the parties agree as follows:

1.      The Term of the Agreement is extended for a period of three (3) years beginning March 1, 2001 and ending March 1, 2004 (the "Extended Term"). This Agreement will automatically renew at the expiration of the Extended Term as outlined in the Agreement.

2.      Carrier wishes to BCGI to develop an unique automatic periodic replenishment utility for it. BCGI will develop and maintain that utility for the cost of $          User trial deployment of this utility is scheduled for May 1, 2001 and commercial deployment is scheduled for May 15, 2001.

3.      Under the Agreement in order to grow its volume capability Carrier would need to purchase additional hardware and software. Under this Addendum BCGI will install BCGI owned equipment on Carrier site to accommodate Carrier's forecast of anticipated volume. The equipment will be owned and operated by BCGI as a service to the Carrier. The warranties as outlined in the Agreement are not applicable to BCGI owned equipment. During the remainder of the Term, if the Carrier requires equipment due to volume in excess of its yearly forecast there will be an implementation charge of $          per instance to cover travel expenses and shipping charges.

4.      The Minutes of Use (MOU) pricing in the Agreement is changed to the following pricing:

| Volume (Minutes/Month) | Per Minute Charge |
|---|---|
| 0 to 50,000 | $ |
| 50,000 to 100,000 | $ |
| 100,001 to 150,000 | $ |
| 150,001 to 250,000 | $ |
| 250,001 to 500,000 | $ |
| 500,001 to 750,000 | $ |

**REDACTED**

| 750,001 to 1,000,000 | $: |
| 1,000,001 to 5,000,000 | $: |
| 5,000,001 + | $: |

The monthly minimum is 65,000 MOUs. On monthly basis Carrier will be billed the greater of the monthly minimum or actual charges for the month. This pricing is effective the first full calendar month following the execution of this Addendum.

The annual Service/Support fee is waived for the remainder of the Agreement.

4.     Customer will use the ROAMER*plus* services as described in Exhibit A for all of its markets for the entire Term of this Agreement. For those markets obligated to another unregistered roaming provider, Customer shall convert those markets to the ROAMER*plus* service within sixty (60) days of the expiration of the current Term of the Agreement with the other provider. If Carrier fails to convert its markets as required herein or during the Term of this Agreement converts markets utilizing the ROAMER*plus* service to another service, or stops sending calls on the assigned ROAMER*plus* 800 #s, the recurring fees charged for Prepaid Connection Services as outlined in Exhibit A will be increased by 10%. This pricing increase is retroactive to the date the markets should have been converted to ROAMER*plus*, are converted from ROAMER*plus* or the date calls are no longer sent to the assigned ROAMER*plus* 800#s.

5.     Customer is responsible for the replacement cost of any BCGI equipment located on Customer's premises which is lost, stolen or damaged. Customer will maintain insurance and will provide security adequate to protect such equipment from theft or damage.

6.     During the Term of this Agreement, BCGI will be the exclusive provider of prepaid wireless services to Customer and Customer will not contract with or receive prepaid wireless services from any other prepaid wireless provider.

Except as herein modified, all terms of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have duly executed this Addendum as an instrument under seal as of the day and year first written above.

Cellular Express, Inc. d/b/a
Boston Communications Group

By: _____

Name: _____

Title: _____


Smith Bagley, Inc. d/b/a
Cellular One of Northeast Arizona

By: _____

Name: RICHARD WATKINS

Title: GM

**REDACTED**

## EXHIBIT A

### ROAMER*plus* Service Description and Terms

BCGI's Roamerplus Service provides call processing, completion and billing services for roamers who are not allowed automatic roaming in the Customer's service area and are routed through the Prepaid Connection Node.

**Services Provided by BCGI.** For all roamer calls routed to the BCGI system from any Carrier switch, the AUTO*plus* automated system will offer all callers the option of billing the call in several different ways. The automated system will explain that roamer services are available for a charge and will provide the customer with the applicable rates if asked. Once the appropriate credit check has been performed and the customer billing method is approved, BCGI will connect the calling party to the requested destination, using BCGI provided facilities, and make arrangements for rating and billing of the call.

**Billing.** BCGI will be responsible for all billing and collection for calls for which ROAMER*plus* Services are provided to Carrier. Billing will be done based upon rates as set forth below which rates may be revised from time to time

| | | |
|---|---|---|
| Usage Rate (per minute+tax) | $ | (Continental United States, Hawaii and Alaska) |
| Call Processing Charge (per call) | | |
| -If call processed through AUTO*plus* | $ | |
| -If call processed utilizing a live operator | $ | |

**Reimbursement to Carrier.** BCGI will reimburse Carrier at the per minute rates set forth in Exhibit A, ROAMER*plus* Pricing. BCGI will bear responsibility for any uncollectable amounts and/or fraudulent billing resulting from the use of calling cards or credit cards. All reimbursements are per minute based on actual completed call minutes.

# ADDENDUM TO PREPAID CONNECTION AGREEMENT

This Addendum to the Prepaid Connection Agreement is made this _12th_ day of _December_, 200 _1_, by and between Cellular Express, Inc. d/b/a Boston Communications Group Inc. ("BCGI") and Smith Bagley, Inc. d/b/a CellularOne of Northeast Arizona ("Carrier").

WHEREAS the parties entered into an agreement entitled "Prepaid Connection Agreement," dated March 1, 2000, for the sale of Prepaid Connection equipment and provision of Services by BCGI to Carrier (the "Agreement"); and

WHEREAS, the parties desire to amend the Agreement to facilitate Carrier's "Class Link" aid program to schools;

NOW, THEREFORE, the parties agree as follows:

1.  Exhibit 2 ("Order Schedule"), Section D ("MOU Pricing"), subsection entitled "Prepaid Card PINS" is hereby modified as follows: all Prepaid Card PIN per PIN fees are hereby waived during the 25 month expected length of Carrier's "Class Link" donation to schools program (the "Class Link Program").

2.  The fee waiver shall begin on the date first appearing above, and shall expire 25 months after such date, or termination of the Class Link Program, whichever occurs sooner. The fee waiver may be extended if the Class Link Program continues by mutual prior written consent of BCG and Carrier.

Except as herein modified, all terms of the Agreement as amended shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have duly executed this Addendum as an instrument under seal as of the day and year first written above.

Cellular Express, Inc. d/b/a                Smith Bagley, Inc. d/b/a CellularOne
Boston Communications Group                 of Northeast Arizona

By: _____                 By: _____

Name: _____                 Name: _Richard Watkins_

Title: _Vp. Sales_                          Title: _GM_

Date: _12/12/01_                            Date: _12-12-01_

**REDACTED**

## ADDENDUM TO PREPAID CONNECTION AGREEMENT

This Addendum to Prepaid Connection Agreement is made this ___12ᵗʰ___ day of August June, 2002, by and between Cellular Express, Inc. d/b/a Boston Communications Group ("BCGI") and Smith Bagley, Inc. d/b/a CellularOne of Northeast Arizona ("Carrier").

WHEREAS BCGI and Carrier entered into an agreement, dated March 1, 2000, (the "Agreement") for the sale of equipment and provision of services by BCGI to Carrier; and

WHEREAS, the parties desire to modify that Agreement;

NOW, THEREFORE, the parties agree as follows:

1.    The Term of the Agreement is extended for an additional year ending March 1, 2005 (the "Second Extended Term"). This Agreement will automatically renew at the expiration of the Second Extended Term as outlined in the Agreement.

2.    The Minutes of Use (MOU) pricing in the Agreement is changed to the following pricing effective retroactively to February 1, 2002:

| Volume (Minutes/Month) | VISIONone Per Minute Charge | Any Other Program Per Minute Charge |
|---|---|---|
| 0 to 50,000 | $ | $ |
| 50,000 to 100,000 | $ | $ |
| 100,001 to 150,000 | $ | $ |
| 150,001 to 250,000 | $ | $ |
| 250,001 to 500,000 | $ | $ |
| 500,001 to 750,000 | $ | $ |
| 750,001 to 1,000,000 | $ | $ |
| 1,000,001 to 1,750,000 | $ | $ |
| 1,750,001 to 5,000,000 | $ | $ |
| 5,000,001 to 10,000,000 | $ | $ |
| 10,000,001+ | $ | $ |

Example: In a given month, if Carrier generates 9 million VISIONone minutes and 1 million other program minutes, Carrier will be charged $          ($          for VISIONone and $          for other program).

3.    BCGI agrees to sell and Carrier agrees to purchase the five installed TIN hardware and software located on Carrier's premises. Carrier will pay $          for such equipment, $          upon execution of this agreement and the remainder in five equal monthly installments of $.

**REDACTED**

4.    Additional TINs and software associated with TINs needed during the Term of the Agreement will be priced at $⬛⬛⬛ per TIN (a standard TIN configuration is attached) plus applicable shipping and handling.    Any hardware necessary outside the scope of a standard TIN configuration will be quoted separately.

5.    Carrier will receive all standard TIN software upgrades to the TIN at no charge during the Term of the Agreement.

6.    Section 3 of the Addendum to the Prepaid Connection Agreement dated March 30, 2001 is deleted.

7.    Carrier has an outstanding balance owed to BCGI as of June 30, 2002 (the "Initial Outstanding Balance") for services provided by BCGI.  If Carrier does not pay the Initial Outstanding Balance, plus the $⬛⬛⬛ for the above equipment in full by November 30, 2002 Carrier will be charged 15% on the entire Initial Outstanding Balance and $⬛ even if a portion has been paid.  Carrier will be invoiced for such charge at some time after November 30, 2002 and such charge will be due according to the terms of such invoice.

Except as herein modified, all terms of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have duly executed this Addendum as an instrument under seal as of the day and year first written above.

Cellular Express, Inc. d/b/a          Smith Bagley, Inc. d/b/a
Boston Communications Group           Cellular One of Northeast Arizona

By: _Kimberly Obremski_               By: _[signature]_

Name: _Kimberly Obremski_             Name: _Richard Watkins_

Title: _V.P. Sales_                   Title: _COO_

**REDACTED**

## ADDENDUM TO PREPAID CONNECTION AGREEMENT

**THIS ADDENDUM** to the Prepaid Connection Agreement is made this __day of _____, 2003, by and between Cellular Express, Inc. d/b/a Boston Communications Group, a Massachusetts corporation with a principal office at 100 Sylvan Road, Woburn, MA 01801 ("BCGI") and Smith Bagley, Inc. d/b/a CellularOne of Northeast Arizona, a District of Columbia corporation with its principal place of business at 1500 South White Mountain Road, Show Low, Arizona 85901 ("Customer" or "Carrier").

**WHEREAS**, BCGI and Carrier entered into an agreement dated March 1, 2000 for the provision of Prepaid Connection Services by BCGI to Carrier (the "Agreement"); and

**WHEREAS**, the parties desire to modify the Agreement;

**NOW, THEREFORE**, the parties agree as follows:

1.  **New SS7 Pricing**

    Carrier wishes to convert its markets to SS7 signaling. The costs for such conversion are as follows:

    Carrier will be billed a pass-through installation cost (travel and expenses for testing) and will be responsible for BCGI's through costs for ISUP duplex route sets through a third party vendor (i.e. Illuminet, TSI, or other).

    For costs for travel and expenses for testing, such costs will not exceed $ provided Carrier gives BCGI at least 14 days notice in order to arrange for travel.

    For costs for route sets, these will be billed by BCGI to Carrier on a "pass-through" basis only, currently estimated at $ per month.

2.  Except as herein modified, all terms of the Agreement shall remain in full force and effect.

**IN WITNESS WHEREOF**, the parties have duly executed this Addendum as an instrument under seal as of the day and year first written above.

Cellular Express, Inc. d/b/a   *SBI, Inc.*           Smith Bagley, Inc. d/b/a   *Cellular Express, Inc.*
Boston Communications Group    *RW*                  CellularOne of Northeast Arizona

By: _____                        By: _____

Name: Richard Watkins                                Name: _____

Title: C.O.O.                                        Title: _____

Date: 2-5-03                                         Date: 2/12/03

Confidential                      Page 1                      2/4/2003

**REDACTED**

## ADDENDUM TO PREPAID CONNECTION AGREEMENT

THIS ADDENDUM to the Prepaid Connection Agreement is made this ___28th___ day of May, 2003, by and between Cellular Express, Inc. d/b/a Boston Communications Group ("BCGI") and Smith Bagley, Inc. d/b/a Cellular One of Northeast Arizona ("Cellular One").

WHEREAS, BCGI and Cellular One entered into an agreement, dated March 1, 2000, (the "Agreement") for the sale of equipment and provision of services by BCGI to Cellular One; and

WHEREAS, the parties desire to modify that Agreement;

NOW, THEREFORE, the parties agree as follows:

1.      BCGI agrees to sell and Cellular One agrees to purchase a Software license upgrade and conversion to PRE-IN for its six existing TIN hardware located on Cellular One's premises. Cellular One will pay $       per upgrade, for a total of $      . 25% is due immediately upon execution of this agreement, the balance due within 30 days following successful PRE-IN implementation.   With the upgrade, this TIN hardware shall become BCGI Intelligent Peripherals (BIPS) and Cellular One shall be converted to BCGI's proprietary PRE-IN processing system.

2.      Cellular One will receive all standard software upgrades to the BIPS at no charge during the Term of the Agreement.

3.      BCGI's travel, travel-related and shipping expenses, and other incidental expenses including but not limited to any required additional hardware or telecommunications or data facilities, will be reimbursed by Cellular One.

4.      If needed BCGI will allow Cellular One to use two additional TINs until conversion is complete, for up to six months whichever occurs first.

5.      BCGI and Cellular One have determined that the implementation should meet Cellular One's projected volumes.  BCGI is not responsible if the implementation fails to handle presented volumes due to inaccurate forecasting, or failure to order or configure facilities per BCGI's recommendations.

6.      Except as herein modified, all terms of the Agreement shall remain in full force and effect.  Equipment and software licensing provided shall be subject to all terms and conditions of the Agreement.

IN WITNESS WHEREOF, the parties have duly executed this Addendum as an instrument under seal as of the day and year first written above.

Cellular Express, Inc. d/b/a                     Smith Bagley, Inc. d/b/a
Boston Communications Group            Cellular One of Northeast Arizona

By: _____            By: _____

Name: _____            Name: __Richard Watkins___

Title: __V.P. Sales_____            Title: __COO_____

Date: __6/4/03_____            Date: __5/28/03_____

EXHIBIT 1
DETAILS REGARDING IMPLEMENTATION



Figure 1. Depicts current Network Architecture.



Figure 2 Depicts proposed Network Architecture.



### Implementation Details

It is recommended that CellularOne convert six of the current TINS they own to Intelligent Peripherals. Four of the TINS should be placed in an active state and T1s representing Trunk Group 3 should be distributed across the TINS for maximum diversity. Two of the TINS should be held in reserve as spares that can be placed into service in the event of a TIN failure.

Travel for installation and testing related to implementing interim TINS and Pre-IN will be billed as a pass-through charge. Shipping costs related to interim TINS will also be passed through to CellularOne.

### Timing

*bcgi* estimates a Pre-IN implementation to take 10-12 weeks from the time the Pre-IN addendum is signed and 25% of the $. total is received by *bcgi*. The remainder of payment is due 30 days after the Pre-IN implementation is complete.

**REDACTED**

## ADDENDUM TO PREPAID CONNECTION AGREEMENT

**THIS ADDENDUM** to the Prepaid Connection Agreement is made this _____ day of _____, 2003, by and between Cellular Express, Inc. d/b/a Boston Communications Group ("BCGI") and Smith Bagley, Inc. d/b/a Cellular One of Northeast Arizona ("Cellular One").

**WHEREAS**, BCGI and Cellular One entered into an agreement, dated March 1, 2000, (the "Agreement") for the sale of equipment and provision of services by BCGI to Cellular One; and

**WHEREAS**, the parties desire to modify that Agreement;

**NOW, THEREFORE**, the parties agree as follows:

1. Cellular One wishes to implement BCGI's hot-lined roaming solution. Cellular One will be charged $ _____ per minute for each hot-lined minute processed in a given month.

2.    Except as herein modified, all terms of the Agreement shall remain in full force and effect. Equipment and software licensing provided shall be subject to all terms and conditions of the Agreement.

**IN WITNESS WHEREOF**, the parties have duly executed this Addendum as an instrument under seal as of the day and year first written above.

Cellular Express, Inc. d/b/a
Boston Communications Group

By: _____

Name: _____

Title: _____

Date: _____

Smith Bagley, Inc. d/b/a
Cellular One of Northeast Arizona

By: _____

Name: _Richard Watkins_____

Title: _COO_____

Date: _1-8-04_____

REDACTED

# ADDENDUM TO PREPAID CONNECTION AGREEMENT

**THIS ADDENDUM** to Prepaid Connection Agreement is made this _____ day of January, 2004, by and between Cellular Express, Inc. d/b/a Boston Communications Group ("BCGI") and Smith Bagley, Inc. d/b/a CellularOne of Northeast Arizona ("Carrier").

**WHEREAS**, BCGI and Carrier entered into an agreement, dated March 1, 2000, (the "Agreement") for the sale of equipment and provision of services by BCGI to Carrier; and

**WHEREAS**, the parties desire to modify that Agreement;

**NOW, THEREFORE**, the parties agree as follows:

1.    Term. The Term of the Agreement is extended for an additional year ending March 1, 2006 (the "Third Extended Term"). This Agreement will automatically renew at the expiration of the Third Extended Term as outlined in the Agreement.

2.    Pricing. The Minutes of Use (MOU) pricing in the Agreement is changed to the following pricing effective with the beginning of the monthly billing cycle next following the date of execution of this Addendum by Carrier and its delivery to BCGI. Pricing applies to all prepaid subscribers and rate plans.

| Tier | Volume (Minutes/Month) | Per Minute Charge |
|---|---|---|
| 1 | 0 to 50,000 | $ |
| 2 | 50,000 to 100,000 | $ |
| 3 | 100,001 to 150,000 | $ |
| 4 | 150,001 to 250,000 | $ |
| 5 | 250,001 to 500,000 | $ |
| 6 | 500,001 to 750,000 | $ |
| 7 | 750,001 to 1,000,000 | $ |
| 8 | 1,000,001 to 1,750,000 | $ |
| 9 | 1,750,001 to 5,000,000 | $ |
| 10 | 5,000,001 + | $ |

Examples: For Tiers 1-9, Carrier receives the tier rate (Per Minute Charge) for all minutes. For example for 2,000,000 monthly minutes the charge would be 2,000,000 X $.      = $/      ). Similarly, for 5,000,000 monthly minutes the charge would be 5,000,000 X $.0300 = $:      However tier 10 rates are an exception to the foregoing: Tier 10 raters apply only to minutes above 5,000,000. For example for 5,010,000 minutes the charge would be $`      +      :=

3. Except as herein modified, all terms of the Agreement shall remain in full force and effect.

**IN WITNESS WHEREOF,** the parties have duly executed this Addendum as an instrument under seal as of the day and year first written above.

Cellular Express, Inc. d/b/a
Boston Communications Group

By: _____

Name: _____

Title: _Vice President, Sales_

Date: __3/4/04__

Smith Bagley, Inc. d/b/a
Cellular One of Northeast Arizona

By: _____

Name: _Richard Watkins_

Title: _CEO_

Date: _2-11-04_

**REDACTED**

## ADDENDUM TO PREPAID CONNECTION AGREEMENT

**THIS ADDENDUM** to Prepaid Connection Agreement is made this 21st day of June, 2004, by and between Cellular Express, Inc. d/b/a Boston Communications Group ("BCGI") and Smith Bagley, Inc. d/b/a CellularOne of Northeast Arizona ("Carrier").

**WHEREAS,** BCGI and Carrier entered into an agreement, dated March 1, 2000, (the "Agreement") for the sale of equipment and provision of services by BCGI to Carrier; and

**WHEREAS,** the parties have amended the Agreement by Addendum dated February 11, 2004 ("February 11 2004 Addendum"); and

**WHEREAS,** the parties desire to modify that Agreement as amended, in consideration of the entering into between BCGI Billing Services, Inc. and Carrier, of a certain Billing and Customer Care Services Agreement ("Billing and Customer Care Services Agreement");

**NOW, THEREFORE,** the parties agree as follows:

1.    Term.  The Term of the Agreement is extended until March 1, 2009 (the "Fourth Extended Term").  This Agreement will automatically renew at the expiration of the Fourth Extended Term as outlined in the Agreement.

2.    Pricing; MoU Pricing.  So long as the Billing and Customer Care Services Agreement is in effect as set forth below and Carrier is paying at least the minimum charges as set forth therein, the following pricing shall be in force.  If for any reason the Billing and Customer Services Agreement is no longer in force, then pricing shall revert to the pricing as set forth in the February 11, 2003 Addendum.

The Minutes of Use (MoU) pricing in the Agreement is changed to the following pricing effective with the beginning of the monthly billing cycle next following the date that all of the following have occurred:  (i) execution of the February 11, 2004 Addendum and this Addendum, (ii) execution of the Billing and Customer Care Services Agreement, and (iii) full commercial launch and billing to Carrier under the Billing and Customer Care Services Agreement.  Pricing applies to all prepaid subscribers and rate plans.

**Prepaid Connection Pricing**

| Tier | Volume (Minutes/Month) | Per Minute Charge |
|------|------------------------|-------------------|
| 1 | 0 to 50,000 | $ |
| 2 | 50,000 to 100,000 | $ |
| 3 | 100,001 to 150,000 | $ |
| 4 | 150,001 to 250,000 | $ |
| 5 | 250,001 to 500,000 | $ |

CONFIDENTIAL - PAGE 1 V.3.18.04

**REDACTED**

| | | |
|---|---|---|
| 6 | 500,001 to 750,000 | $ |
| 7 | 750,001 to 1,000,000 | $ |
| 8 | 1,000,001 to 1,750,000 | $ |
| 9 | 1,750,001 to 5,000,000 | $ |
| 10 | 5,000,001 to 7,500,000 | $ |
| 10 11 | 7,500,001 + | $ |

Examples: For Tiers 1-9, Carrier receives the tier rate (Per Minute Charge) for all minutes. For example for 2,000,000 monthly minutes the charge would be 2,000,000 X $.    = $. Similarly, for 5,000,000 monthly minutes the charge would be 5,000,000 X $    = $ However tier 10 & 11 rates are incremental and exception to the foregoing: Tier 10 raters apply only to minutes above 5,000,000 and tier 11 only applies to minutes over 7,500,000. For example for 7,600,000 minutes the charge would be $'    ) + $  0) + $`    = $'

3. Pricing; Web Care. The Parties hereby document in writing the existing understanding and agreement that Carrier receives up to 45 concurrent user licenses (logins) to use and access BCGI's Web Care subscriber data access feature. Web Care is provided as a feature of the Services under the Agreement. For additional concurrent licenses (logins), there is a one-time charge of $    per license (login) which includes annual maintenance for one year. As to these additional purchased licenses, once the first year has expired, there is an annual licensing charge of $    per license (login) per year, payable in advance. The licenses are limited to use of Web Care under the Agreement, so long as the Agreement is in effect.

4. Except as herein modified, all terms of the Agreement shall remain in full force and effect.

**IN WITNESS WHEREOF**, the parties have duly executed this Addendum as an instrument under seal as of the day and year first written above.

Cellular Express, Inc. d/b/a
Boston Communications Group

By: _____

Name: _____

Title: Vp Sales

Date: 6/30/04

Smith Bagley, Inc. d/b/a
Cellular One of Northeast Arizona

By: _____

Name: Richard Watkins

Title: COO

Date: 6-16-04

CONFIDENTIAL - PAGE 2 V.3.18.04

# EXHIBIT C

## DECLARATION OF LARRY L. DAY

I, Larry L. Day, depose and state as follows:

(1)    I am President of Freedom Wireless, Inc. ("Freedom Wireless"), which has a principal
       place of business at 132 South Central Avenue, Suite 232, Phoenix, Arizona 85004. The
       facts set forth in this Declaration are based on my personal knowledge.

(2)    On March 30, 2000, Freedom Wireless sued Boston Communications Group, Inc.
       ("BCGI") and several wireless carriers alleging that they infringed one patent for prepaid
       wireless services owned by Freedom Wireless. The suit was later amended to include an
       additional patent owned by Freedom Wireless.

(3)    On May 20, 2005, after a jury trial in the United States District Court for the District of
       Massachusetts, the jury rendered its verdict finding that BCGI and the carrier defendants
       infringed the patents-in-suit, that the patents were valid and awarding damages to
       Freedom Wireless.

(4)    On September 1, 2005, the United States District Court for the District of Massachusetts
       issued its Findings of Fact and Conclusions of Law finding that Freedom Wireless did not
       engage in inequitable conduct and ruling that the patents-in-suit are enforceable. That
       same day, the District Court entered Judgment "in accordance with the verdict of the jury
       returned on May 20, 2005 on the issues of infringement, invalidity and damages, and in
       accordance with the Findings of Fact and Conclusions of Law of the Court issued on
       September 1, 2005." All parties filed appeals to the United States Court of Appeals for
       the Federal Circuit.

(5)    On October 12, 2005, the District Court issued an Order for Permanent Injunctive Relief
       Pursuant to 35 U.S.C. § 283 enjoining BCGI and the carrier defendants from, among

other things, making, using, selling, or offering to sell the infringing technology. Thereafter, BCGI and others moved to stay the injunction pending appeal. On December 15, 2005, the United States Court of Appeals for the Federal Circuit issued an Order staying the injunction pending appeal.

(6)    While the case was on appeal, the parties entered into a settlement agreement that was expressly conditioned on the District Court vacating certain Orders and the Judgment, including the Order for Permanent Injunctive Relief.

(7)    As part of the settlement between Freedom Wireless and the defendants (including BCGI), in July 2006, Freedom Wireless and BCGI entered into a License Agreement pursuant to which BCGI and its customers, third-party contractors and suppliers were licensed to use the infringing technology.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 26th day of SEPTEMBER, 2007.

_____

Larry L. Day

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CELLULAR EXPRESS, INC. d/b/a BOSTON COMMUNICATIONS GROUP AND BOSTON COMMUNICATIONS GROUP, INC. | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO: 07-694 (rbw) |
| v. | ) ) ) | |
| SMITH BAGLEY, INC. d/b/a CELLULAR ONE OF NORTHEAST ARIZONA | ) ) ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF MIKE PALACKDHARRY

I, Mike Palackdharry, having been duly sworn, deposes and says as follows:

1. I am the Vice President of Sales of Boston Communications Group, Inc. ("BCGI"). The facts set forth in this Declaration are based on my personal knowledge.

2. In March, 2000, Freedom Wireless, Inc. filed a patent infringement action in the United States District Court for the District of Massachusetts against BCGI and a number of others.

3. On October 12, 2005, the District Court enjoined BCGI "from making, using, selling, or offering to sell the prepaid wireless service implementations—multi-frequency (MF), common channel signaling system seven (SS7), and pre-intelligent network (pre-IN)—found to infringe Plaintiff Freedom Wireless, Inc.'s patents."

4. The injunction provided "a 'grace period' of 90 days from today's date [October 12, 2005], during which defendants are prohibited from adding any new prepaid

customers, for defendants' customers to use the remainder of their prepaid balances and find an alternative carrier."

5.    In accordance with the grace period, BCGI continued serving its customers at the same level after the injunction was issued.

6.    On February 2, 2006, BCGI's Network Operations Center noticed a dramatic drop in telecommunications traffic from Smith Bagley.  Upon inquiry from BCGI, the Smith Bagley switch tech informed the BCGI Network Operations Center that they expected this behavior as they were currently moving facilities to their new prepaid platform.

7.    In immediate follow-up to the February 2, 2006 Smith Bagley communication, BCGI's Client Relations liaison to Smith Bagley, Tim Quinlivan, spoke with Smith Bagley's Chief Operations Officer, Richard Watkins, to inquire about the drop-off in telecommunications traffic.

8.    Mr. Watkins responded to the February 2 BCGI inquiry by forwarding a pdf letter to Mr. Quinlivan announcing that Smith Bagley was unilaterally terminating the PCA effective January 31.  This termination letter was dated January 17.

9.    It is my understanding that Smith Bagley replaced the services of BCGI with those of VeriSign Inc.

10. In July 2006, Freedom Wireless and BCGI entered into a settlement agreement contingent on the trial court's vacatur of the injunction and the judgment against BCGI.

11. As part of the settlement agreement, Freedom Wireless granted to BCGI licenses to use the infringing technology.  These licenses expressly permitted use of the technology by BCGI's customers (including Smith Bagley), partners, and suppliers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this *28* day of *September,* 2007.

Mike Palackdharry
Vice President of Sales, BCGI

# EXHIBIT E

REDACTED

-----Original Message-----
From: Richard Watkins [mailto:RWatkins@cellularoneaz.com]
Sent: Tuesday, December 20, 2005 8:22 AM
To: Caprice Crebar
Cc: Abbie Crozier
Subject: RE: BOSTON COMMUNICATIONS GROUP, INC. - A New Lease On Life

Lets wait until after the holidays

Richard Watkins

-----Original Message-----
From: Caprice Crebar [mailto:CCrebar@bcgi.net]
Sent: Monday, December 19, 2005 3:09 PM
To: Richard Watkins
Cc: Abbie Crozier
Subject: FW: BOSTON COMMUNICATIONS GROUP, INC. - A New Lease On Life

Hi Richard -

Sorry about the confusion on the date of the call.  Unfortunately, B.Y.s and Ersin's
schedules don't work out for tomorrow.  Since the news on the stay of the injunction, I

3

hope that has given everyone more comfort about the future of bcgi. Is a call with E.Y. necessary now? He'd still be glad to discuss our future if you would like. Just let me know what issues you would still like him to address. Attached is coverage from Morgan Keenan on bcgi that provides great insight on our future. Great news is that you can continue to rely on bcgi's service.

I would still like to have some time with you tomorrow. Abbie says you can do it at 1:30MT. If that still works, I will call you then.

Thank you!

Caprice Crebar
949-425-1755

-----Original Message-----
From: Kimberly Obremski
Sent: Monday, December 19, 2005 1:12 PM
To: Business Development Directors - Domestic
Subject: FW: BOSTON COMMUNICATIONS GROUP, INC. - A New Lease On Life

Great report...

-----Original Message-----
From: Karen Walker
Sent: Monday, December 19, 2005 2:35 PM
To: Executive Management; Dan Brosnan; Julie Brenner; Chris Harrall; 'flane@laneberry.com'; Berry, Bob; Steele, Jon; Brian Boyle; E. Snowden; Fritz Von Mering; Jerry McGowan; Jim Dwyer; Paul R. Gudonis (pgudonis@gmail.com); paul tobin
Cc: Fran Boyd
Subject: FW: BOSTON COMMUNICATIONS GROUP, INC. - A New Lease On Life

After a significant drought of analyst coverage and interest in bcgi, I am please to report that we have renewed interest by Morgan Keegan.
Tavis McCourt also covers RIM so he is very familiar with patent issues as well as and the potential upside for bcgi. Please see his attached report.

Karen

Copy: Segel

-----Original Message-----
From: McCourt, Tavis [mailto:Tavis.McCourt@morgankeegan.com]
Sent: Monday, December 19, 2005 2:28 PM
To: ODonnell, Christoph
Subject: BOSTON COMMUNICATIONS GROUP, INC. - A New Lease On Life

 Greetings,

     * On December 15th the CAFC stayed an injunction against BCGI pending its appeal of the Freedom Wireless case
     * The appeals court decision should take 12-18 months, with further legal proceedings a real possibility
     * BCGI has clearly received a new lease on life, and the company should now have more success signing up new customers and diversifying its revenue stream
     * We are initiating 2006 estimates of revenue of $93.6 million and EBITDA of $14.6 million

Please see attached disclosures.

Please feel free to call with questions/comments - Tavis McCourt
615.665.3644

---------------------------------------------
                                              4

# EXHIBIT F

# Robert J. Higgins, P.C.

Attorneys at Law
Pinetop Financial Center
1630 East White Mountain Boulevard, Suite B
Pinetop, Arizona 85935
Telephone (928) 367-2448 Facsimile (928) 367-1977
higginslawfirm@citlink.net

January 17, 2006

Mr. E. Y. Snowden
Boston Communications Group, Inc.
55 Middlesex Turnpike
Bedford, MA 01730

Dear Mr. Snowden,

In light of recent events in your litigation with Freedom Wireless, CellularOne of North East Arizona has decided that there is no other choice but to pursue a business relationship with another company and terminate our relationship with your company. We will no longer need your services as of January 31, 2006. I am attaching a copy of Judge Harrington's Order of October 12, 2005 which says in pertinent part "defendants' [BCGI] customers to use the remainder of their prepaid balances and find an alternative carrier." Accordingly, we are acting on the Court's order.

Your company should not deem this notice as a waiver of your obligation to defend, indemnify and hold harmless Smith Bagley, Inc. dba CellularOne of North East Arizona in any litigation pursuant to our agreement. Please promptly inform us of the status of your litigation with Freedom and any involvement our company may have in that litigation. Thank you.

Sincerely,

Robert J. Higgins
Robert J. Higgins Law Firm, P.C.
Attorneys for CellularOne of Northeast Arizona

RJH/tm

Enclosure

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

FREEDOM WIRELESS, INC.,
            Plaintiff

v.

BOSTON COMMUNICATIONS GROUP,
INC., ET AL.,
            Defendants.

CIVIL ACTION NO.:
    00-12234-EFH

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER FOR PERMANENT INJUNCTIVE
## RELIEF PURSUANT TO 35 U.S.C. § 283

October 12, 2005

HARRINGTON, S.D.J.

The Court hereby enters an Order granting permanent injunctive relief pursuant to 35

U.S.C. § 283. Defendants herein are enjoined from making, using, selling, or offering to sell the

prepaid wireless service implementations – multi-frequency (MF), common channel signaling

system seven (SS7), and pre-intelligent network (pre-IN) – found to infringe Plaintiff Freedom

Wireless, Inc.'s patents. This injunction prohibits each defendant and each of their officers,

agents, servants, employees, and attorneys and those persons in active concert or participation

with one or more of the foregoing who receive actual notice of this Order by personal service or

otherwise from (i) individually making, using, selling, or offering to sell any of the above-listed

implementations, or any systems that are not colorably different, (ii) jointly making, using, selling,

or offering to sell any of these implementations, or any systems that are not colorably different, or

(iii) acting in concert with any third party, other than a licensee of Freedom Wireless, Inc., to

make, use, sell, or offer to sell any of these implementations, or any systems that are not colorably different.

This injunction provides a "grace period" of 90 days from today's date, during which defendants are prohibited from adding any new prepaid customers, for defendants' customers to use the remainder of their prepaid balances and find an alternative carrier. During this 90-day grace period, defendants shall pay to Freedom Wireless, Inc., the royalty of 2.5 cents per minute of use by their customers, and provide monthly statements to Freedom Wireless, Inc., detailing that use.

SO ORDERED.

/s/ Edward F. Harrington
EDWARD F. HARRINGTON
United States Senior District Judge

# EXHIBIT G



BY FAX AND CERTIFIED MAIL
(928) 367-1977

February 3, 2006

Robert J. Higgins, Esq.
Robert J. Higgins, P.C.
Pinetop Financial Center
1630 East White Mountain Boulevard, Suite B
Pinetop, AZ 85935

Dear Mr. Higgins:

This letter is in response to your letter, dated January 17, 2006, to Mr. E.Y. Snowden, a copy of which we received for the first time yesterday. We are shocked that your client, Cellular One of NorthEast Arizona has chosen to pursue a business relationship with another company. Our company and Cellular One of NorthEast Arizona have had a long, very cordial and mutually beneficial relationship. Your letter came as a total surprise to bcgi, and we only learned of the letter after our Network Operations Center noticed the dramatic drop in telecommunications traffic from your client. Upon telephoning your client, we were informed that a migration of customers to another company's system was in progress.

In your letter, you stated that your client was acting on the order of the trial court in certain patent litigation in which bcgi is engaged. However, as your client was informed in mid-December, that order was stayed by the United States Court of Appeals for the Federal Circuit. It has no current force or effect. It is certainly not an impediment to our provision to you of the same high-quality service we have always provided to Cellular One of NorthEast Arizona.

As you may know, Cellular One of NorthEast Arizona and bcgi have a Prepaid Connection Agreement which has a term extending until March 1, 2009. Pursuant to the Addendum to that contract, made March 30, 2001, the parties agreed that:

"During the Term of this Agreement, BCGI will be the exclusive provider of prepaid wireless services to Customer and Customer will not contract with or receive prepaid wireless services from any other prepaid wireless provider."

By entering into a business relationship with another company to provide prepaid service to its customers, Cellular One of NorthEast Arizona is in breach of its contract with bcgi.

55 Middlesex Turnpike
Bedford, MA 01730
tel: 781-904-5000
fax: 781-904-5601
www.bcgi.net
Boston Communications Group, Inc.

Robert J. Higgins, Esq.
February 3, 2006
Page 2

    This letter is to respectfully request that your client honor the terms of its contract and immediately restore the service relationship. If this is not done, bcgi will have to consider the legal remedies we have under the contract. We regret that such a long and productive relationship should come to such an apparently abrupt end, and ask that you respond to us within five business days of your client's intentions. We sincerely hope that Cellular One of NorthEast Arizona will choose to do the right thing and honor its contract and continue to do business with bcgi, as the parties have agreed.

                      Very truly yours,

                      Alan J. Bouffard
                      Vice President & General Counsel

AJB/bh

**<u>Certificate of Service</u>**

I hereby certify that on September 28, 2007, a true and correct copy of Plaintiffs' Motion for Partial Summary Judgment, Memorandum in Support, Proposed Order, Statement of Material Facts as to Which There is No Genuine Issue, and accompanying exhibits were served on the following parties via the Court's electronic filing system:


Leo G. Rydzewski (D.C. Bar No. 459979)
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006
(202) 955-3000
(202) 955-5564 – fax
Counsel for Defendant

James D. Smeallie (*admitted pro hac*)
Elizabeth M. Mitchell (*admitted pro hac*)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
Counsel for Defendant


<u>/s/ Christopher B. Mead</u>
Christopher B. Mead